

TEN SOUTH WACKER DRIVE
SUITE 3000
CHICAGO, ILLINOIS 60606-7407

TEL: 312.463.5000
FAX: 312.463.5001
www.bannerwitcoff.com

Christopher J. Renk
crenk@bannerwitcoff.com

August 10, 2017

<u>Via ECF</u>

Mr. Jan Horbaly
Clerk of Court
United States Court of Appeals for the Federal Circuit
717 Madison Place N.W.
Washington, D.C. 20439

> **Re:** ***Converse Inc. v. International Trade Commission*, Case No. 16-2497**
> **<u>Appellant's Citation of Supplemental Authority Pursuant to Rule 28(j)</u>**

Dear Mr. Horbaly,

Appellant Converse Inc. ("Converse") respectfully submits this letter under Fed. R. App. P. 28(j) to alert the Court to pertinent, significant authority that bears on the above referenced case ("this Appeal").

On August 3, 2017—the day after Converse filed its Reply Brief in this Appeal—the District of Oregon rendered an opinion on summary judgment motions in *adidas America, Inc. v. Skechers USA, Inc.*, No. 3:15-cv-01741 ("Opinion"). The *adidas* case involves a footwear trade dress comprised of multiple elements ("Trade Dress") used in connection with an "iconic sneaker" (adidas's Stan Smith), and a party (Skechers U.S.A., Inc.) and survey expert (Ms. Sarah Butler) common to this Appeal. (Opinion 2, 4, 12–13, 21.) The Opinion supports several arguments in Converse's Principal Brief (ECF Nos. 77–78) ("CPB") and Reply Brief (ECF Nos. 177–178) ("CRB").

Relevant to Converse's arguments at CPB 58–70 and CRB 17–19, the court held "adidas has a very strong case that the Stan Smith Trade Dress has acquired distinctiveness," notwithstanding adidas' lack of survey evidence. (Opinion at 20–22, 27 (noting "survey data is not a requirement and secondary meaning can be, and most often is, proven by circumstantial evidence").) The court considered adidas's sales, promotion, and marketing expenditures of the Stan Smith; adidas's length, manner, and exclusivity of using the Trade Dress; the Stan Smith's accolades (*e.g.*, a "classic of design") and popularity among celebrities; and evidence Skechers "deliberately cloned the Stan Smith down to the millimeter." (Opinion at 23–27, 30.)

Mr. Jan Horbaly
August 10, 2017
Page 2


    Relevant to Converse's arguments at CPB 39–57 and CRB 8–13, 15–17, the court rejected alleged third-party use evidence as "weak" because, *inter alia*, it was insignificant and/or inconsistent compared to adidas's use of the trade dress.  (Opinion at 23–24; *see also* Opinion at 17–18.)

    Relevant to Converse's arguments at CRB 23–26, the court granted summary judgment of non-functionality, rejecting Skechers' "'divide and conquer' approach" that viewed design elements in isolation and "ma[de] no attempt to argue that the trade dress, as a whole, offers utilitarian advantages."  (Opinion at 30.)


                            Sincerely,

                             /s/ Christopher J. Renk
                            Christopher J. Renk
                            *Counsel for Appellant Converse Inc.*


Enclosure

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ADIDAS AMERICA, INC., a Delaware
corporation; ADIDAS AG, a foreign
entity; and ADIDAS INTERNATIONAL
MARKETING B.V., a foreign entity,

       Plaintiffs,

  v.

SKECHERS USA, INC., a Delaware
corporation,

       Defendant.

No. 3:15-cv-01741-HZ

OPINION & ORDER

Stephen M. Feldman
Perkins Coie LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR 97209

OPINION & ORDER - 1

R. Charles Henn Jr.
Charles H. Hooker III
Nichole D. Chollet
Kilpatrick Townsend & Stockton LLP
1100 Peachtree Street, Suite 2800
Atlanta, GA 30309

        Attorneys for Plaintiffs

Kenneth R. Davis II
Parna A. Mehrbani
Lane Powell PC
601 SW Second Avenue, Suite 2100
Portland, Oregon 97204

Daniel M. Petrocelli
Mark A. Samuels
Jeffrey A. Barker
Jordan Raphael
O'Melveny & Myers LLP
400 South Hope Street, Suite 1800
Los Angeles, California 90071

        Attorneys for Defendant

HERNÁNDEZ, District Judge:

Plaintiff adidas brings trademark infringement claims against Defendant Skechers

concerning three different shoes (collectively "the disputed footwear"). First, adidas alleges that

Skechers's Onix shoe infringes its Stan Smith Trade Dress. The Stan Smith shoe is an iconic

white leather sneaker with a green mustache-shaped heel patch. Skechers's Onix shoe was

designed to mimic the classic Stan Smith shoe and the two shoes appear strikingly similar.

Second, adidas alleges that Skechers's Cross Court shoe infringes adidas's famous Three-Stripe

Mark. The Cross Court features a sideways "E" shaped design that adidas claims look like its

Three-Stripe Mark. Lastly, adidas claims that Skechers infringed its Supernova Mark by selling a

shoe also named Supernova. Before the Court are the parties' cross motions for partial summary

OPINION & ORDER - 2

judgment as to adidas's infringement claims and Skechers's affirmative defenses. The parties

also move for summary judgment on several remedy-related issues.

    With respect to the parties' substantive trademark disputes, the Court rules as follows.

The Court DENIES Skechers's motions for summary judgment regarding adidas's trademark

infringement claims as to all of the disputed footwear. The Court GRANTS adidas's motions for

summary judgment on Skechers's functionality affirmative defense as to the Stan Smith Trade

Dress and on Skechers's descriptive fair use defense as to the Supernova Mark. The Court also

GRANTS adidas's unopposed motion that the parties' 1995 Agreement is valid and has not been

superseded.

    The Court makes the following rulings regarding the parties' remedy disputes. The Court

GRANTS in part adidas's motion that Skechers cannot reduce its profits using overhead costs

that it did not actually incur. The Court RESERVES ruling on adidas's motions that Skechers

cannot deduct income tax expenses from its profits. The Court GRANTS adidas's motions that

Skechers cannot reduce its profits by using a royalty rate theory or its likelihood of confusion

survey results. Lastly, the Court DENIES Skechers's motion that adidas cannot claim reasonable

royalty rate damages.

## BACKGROUND

    adidas is a world-famous shoe manufacturer and Skechers is the second largest shoe

producer in the United States. Murphy Decl. ¶ 8, ECF 7; Henn Resp. Decl. Ex. 18, at ¶ 3, ECF

166. Skechers's uses a "serialized branding strategy" it calls "Skecherizing," which involves

"transform[ing] market trends into unique footwear products by prominently featuring Skechers'

famous marks, brands, and logos on the products themselves and on their packaging." Henn

Resp. Decl. Ex. 18, at ¶ 9. Since 1995, the parties have entered into several settlement

agreements as the result of litigation based on Skechers's alleged infringement of adidas's trademarks. Henn Resp. Decl. Exs. 1–7.

Now, the parties litigate whether Skechers infringed adidas's trademark rights regarding the Stan Smith Trade Dress, the Three-Stripe Mark, and the Supernova Mark. The Court previously granted adidas's motion for a preliminary injunction enjoining Skechers from continuing to sell the disputed footwear. *See* Op. & Order, Feb. 12, 2016, ECF 83.

## I.    The Stan Smith Trade Dress and the Onix Shoe

adidas alleges that Skechers's Onix shoe infringes the Stan Smith Trade Dress:

**The Stan Smith Trade Dress**    **The Skechers "Onix"**

 

Henn Resp. Decl. ¶ 12. The Stan Smith shoe was commonly worn by tennis players in the 1970s and gained its namesake from Stan Smith, who wore the shoe when he won Wimbledon in 1972. Roach Decl. ¶ 6, ECF 133. Since the shoe's creation, adidas has spent tens of millions of dollars on advertising the shoe and sold approximately 40 million pairs world-wide. Beaty Decl. ¶ 11, ECF 8; Beaty Supp. Decl. ¶¶ 17–19, ECF 67; Henn Resp. Decl. Exs. 39, 42, 43. The Stan Smith shoe has garnered accolades as an iconic sneaker and it has been prominently worn by celebrity entertainers and athletes. Naderi-Nejad Decl. ¶¶ 11–12, ECF 134.

In 2013, adidas "made a strategic decision to clean up the market" by making it "virtually impossible" to buy the Stan Smith shoe for one year. Transcript of Oral Argument at 44–45, Dec.

15, 2015, ECF 81. In adidas's view, this decision would help to avoid flooding the market with Stan Smith shoes and retain its premium status. *Id.* In 2014, the adidas Originals division launched a campaign it called "The Return of the Stan Smith." *Id.* at 45. This campaign involved aggressive marketing of the Stan Smith shoe which included creating custom limited editions of the shoe, grassroots events, social media, and product placement with celebrities. *Id.* at 45–48. adidas touted the campaign as a success which garnered more than $12.5 million in sales in its first nine months of 2015. Beaty Supp. Decl. ¶ 19.

By at least June of 2014, Skechers began designing the Onix shoe which it intended to be a "Skecherized" version of the Stan Smith shoe. Henn Resp. Decl. Exs. 19–21, 65 at 4. As depicted above, the two shoes share many of the same design features. The most noticeable difference is that the Onix shoe features a 5x4 matrix of perforations whereas the Stan Smith shoe contains three rows of perforations in the Three-Stripe Mark pattern. In July of 2015, Skechers introduced the Onix shoe to the market. Raphael Decl. Ex. 33, ECF 152–159. adidas claims that Skechers created the Onix shoe in bad faith in order to profit from the goodwill garnered by the strength of the Stan Smith Trade Dress.

## II.     The Three-Stripe Mark and the Cross Court Shoe

adidas has used its famous Three-Stripe Mark on footwear since at least 1952. Murphy Decl. ¶ 8.The Three-Stripe Mark appears, among other places, on a variety of adidas's products, storefronts, packaging, and advertisements. Henn Resp. Decl. Ex. 66, at 31–32; Exs. 67–70. It is widely recognized and consumers strongly associate the Three-Stripe Mark with adidas. Henn Decl. Ex. 66, at 33–34. adidas has spent millions of dollars advertising its flagship Three-Stripe Mark and it attributes billions of dollars in global sales to products bearing the mark. Murphy Decl. ¶ 10; Transcript of Oral Argument at 23.

OPINION & ORDER - 5

Since the mid-1990s, adidas has brought several lawsuits against Skechers for infringing the Three-Stripe Mark. The parties settled their first dispute regarding the mark in 1995. Henn Resp. Decl. Ex. 1. In the 1995 Agreement, Skechers agreed not to use the Three-Stripe Mark or any mark confusingly similar to it. *Id.* Since then, the parties have skirmished several times over the Three-Stripe Mark. Henn Resp. Decl. Exs. 1–7. Each time, the parties settled their dispute and Skechers agreed to stop selling the challenged footwear. *Id.*

In 2015, adidas learned that Skechers was producing the Cross Court shoe. Henn Resp. Decl. ¶ 9. The Cross Court shoe features an "E" shaped design that Skechers describes as "a piece of dark-colored fabric on the side panel that extends from the sole of the shoe to the eyebrow and vaguely resembles a sideways 'E.'"

Skechers Relaxed Fit Cross Court TR   adidas Ultra Boost with the Three-Stripe Mark

 

Def.'s Mot. Summ. J. 6, ECF 151; Vanderhoff Decl. ¶ 18, ECF 9; Pl.'s TRO Mot. 4, ECF 6. adidas alleges that the Cross Court's "E" design is confusingly similar to the Three-Stripe Mark in violation of the parties' 1995 Agreement and trademark law. Henn Resp. Decl. ¶ 9.

## III.    The Supernova Mark

adidas alleges that Skechers's "Relaxed Fit Supernova" shoe infringes its Supernova Mark. adidas has produced, sold, and promoted footwear under the Supernova Mark since the late 1990s. Compl. Exs. 14–16, ECF 1. Skechers produced a shoe identified on its website and packaging as "Supernova."





Raphael Resp. Decl. Exs. 13, 14, ECF 162. Skechers's position is that it used the term

"Supernova" not as a trademark, but to describe the shoe's "cosmic" color scheme. Def.'s Resp.

13–14, ECF 161.

## IV.    The Parties' Motions

Before the Court are the following motions. adidas moves for summary judgment on four

issues:

> (1) Skechers's Fourth Affirmative Defense (Functionality), on the ground that no genuine issue of material fact exists that the combination of elements comprising the Stan Smith Trade Dress are non-functional;

> (2) Skechers's Seventh Affirmative Defense (Descriptive Fair Use), on the ground that no genuine issue of material fact exists that Skechers used the SUPERNOVA Mark as a trademark to identify one of its shoe styles and did not use the mark descriptively;

> (3) The validity and enforceability of the 1995 Settlement Agreement between adidas and Skechers, on the ground that it was not subsequently superseded as alleged by Skechers; and

> (4) Skechers's profit-reduction theories, including (i) the deduction of costs not actually incurred in connection with the accused shoes, (ii) the deduction of income taxes, and (iii) Skechers's expert's so-

called "apportionment" theories, on the ground that they lack legal
and factual support.

Pl.'s Mot. Summ. J. 1, ECF 132. Skechers moves for summary judgment on three issues:

> (1) adidas' First through Seventh Claims for infringement and
> dilution by Skechers' RELAXED FIT® Cross Court TR shoe (the
> "Cross Court"), on the ground that there is no genuine issue of
> material fact and Skechers is entitled to judgment as a matter of
> law because adidas cannot establish likelihood of confusion or
> dilution;

> (2) adidas' First, Second, Third, Fifth, and Sixth Claims for
> infringement and dilution of adidas' purported "STAN SMITH
> Trade Dress" by Skechers' Onix shoe (the "Onix"), on the ground
> that there is no genuine issue of material fact and Skechers is
> entitled to judgment as a matter of law because adidas has not
> clearly defined and cannot demonstrate ownership of the claimed
> "STAN SMITH Trade Dress"; and

> (3) adidas' claim for actual damages, which is premised solely on
> the reasonably royalty analysis, because there is no genuine issue
> of material fact and there is no legal basis for such an award.

Def.'s Mot. Summ. J. 1.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if there is no genuine dispute as to any material fact

and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The

moving party bears the initial responsibility of informing the court of the basis of its motion and

identifying those portions of "'the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any,' which it believes demonstrate the

absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)

(quoting former Fed. R. Civ. P. 56(c)). Once the moving party meets its initial burden of

demonstrating the absence of a genuine issue of material fact, the burden then shifts to the

nonmoving party to present "specific facts" showing a "genuine issue for trial." *Fed. Trade*

OPINION & ORDER - 8

*Comm'n v. Stefanchik*, 559 F.3d 924, 927–28 (9th Cir. 2009) (quoting *Horphag Research Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir. 2007)). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. *Suever v. Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011) (citing *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1166 n.1, 1167 (9th Cir. 2007)).

DISCUSSION

As to trademark infringement, the Court will discuss: (I) adidas's Stan Smith Trade Dress and Skechers's Onix shoe; (II) adidas's Three-Stripe Mark and Skechers's Cross Court shoe; and (III) Skechers's purported fair use of adidas's Supernova Mark. Next, the Court will turn to the parties' damages-related motions: (IV) adidas's motions on Skechers's profit-reduction theories; and (V) Skechers's motion on adidas's claim for royalty rate damages.

**I.    adidas's Stan Smith Trade Dress and Skechers's Onix Shoe**

Skechers moves for summary judgment on adidas's claims against the Onix on three grounds. First, Skechers argues that the trade dress is generic and therefore unprotectable because it is indefinite and overbroad. Second, Skechers argues that the trade dress is generic on the additional ground that it is so common to the industry that it cannot be said to identify a particular source. Third, Skechers argues that the trade dress is not distinctive because adidas cannot establish secondary meaning for it. adidas moves for summary judgment on Skechers's Functionality Defense.

A.      *Trade Dress Law*

Section 43(a) of the Lanham Act provides a cause of action to trade dress producers

against "[a]ny person who . . . uses in commerce any word, term, name, symbol, or device, or

any combination thereof" which "is likely to cause confusion, or to cause mistake, or to deceive

as to the affiliation, connection, or association . . . or as to the origin, sponsorship, or approval of

his or her goods." 15 U.S.C. § 1125(a)(1). This statute's protection traditionally applied to

trademarks but has since been expanded to cover unregistered "trade dress" as well. *See* THOMAS

MCCARTHY, 1 MCCARTHY ON TRADEMARKS § 8:1 (4th ed. 2002) [hereinafter, "MCCARTHY"];

*Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 776 (1992) (Stevens, J., concurring)

(agreeing with the court's conclusion that under § 43(a) unregistered trade dress "should receive

essentially the same protection as those that are registered").

Trade dress "involves the total image of a product and 'may include features such as size,

shape, color, color combinations, texture, or graphics.'" *Vision Sports, Inc. v. Melville Corp.*, 888

F.2d 609, 613 (9th Cir. 1989) (quoting *Rachel v. Banana Republic, Inc.*, 831 F.2d 1503, 1506

(9th Cir. 1987)). It has been well-established for a century that courts examine the total

combination of elements that make up a trade dress. MCCARTHY § 8:2 ("A defendant cannot

avoid liability for infringing a trade dress by segregating out individual elements of the trade

dress as defined by plaintiff and arguing that no one of these is valid and protectable in and of

itself."); *see also O. & W. Thum Co. v. Dickinson*, 245 F. 609, 619 (6th Cir. 1917) (same). The

Ninth Circuit has "stressed the importance of evaluating the establishment's combination of

visual elements that, taken together, may create a distinctive visual impression." *Clicks Billiards,*

*Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1259 (9th Cir. 2001) (internal quotation marks,

alterations, and citations omitted). "Trade dress is the composite tapestry of visual effects." *Id.*

As a preliminary matter, a plaintiff alleging trade dress infringement must establish that the trade dress is not generic such that it is unprotectable. *Walker & Zanger, Inc. v. Paragon Indus., Inc.*, 549 F. Supp. 2d 1168,1174 (N.D. Cal. 2007) (setting forth three situations in which a trade dress may be generic); *see also* MCCARTHY § 8:3 (emphasizing the importance of having specific and defined trade dress elements). "[T]he rule against enforcing generic product features guards against the acquisition of broad trademark exclusivities that bear little relation to consumer confusion." *Walker*, 549 F. Supp. 2d at 1174. "Genericness" exists in situations where the "definition of a product design is overbroad or too generalized . . . or[] if the product design is so common in the industry that it cannot be said to identify a particular source." *Id.*

To state a trade dress infringement claim under § 43(a), "a plaintiff must meet three basic elements: (1) distinctiveness, (2) nonfunctionality, and (3) likelihood of confusion." *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 (9th Cir. 1998). Distinctiveness can either be inherent or acquired through secondary meaning. *Id.* at 1048 (citing *Two Pesos*, 505 U.S. at 769). A trademark is inherently distinctive if its "intrinsic nature serves to identify a particular source." *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210 (2000) (quoting Lanham Act § 43(a)). For example, "Camel" cigarettes, "Kodak" film, or "Tide" laundry detergent. *Id.* A mark acquires secondary meaning when "in the minds of the public, the primary significance of a mark is to identify the source of the product itself." *Id.* at 211 (quotation and alteration omitted).

As to the second element, a product feature is functional and therefore uncovered by trademark law "if the product feature is essential to the use or purpose of the article or if it affects the costs or quality of that article, that is, if exclusive use of the feature would put competitors at a significant, non-reputation-related disadvantage." *Kendall-Jackson*, 150 F.3d at

1048 (internal quotation marks and alterations omitted) (citing *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165 (1995)). Functionality is the province of patent law rather than trademark law because the former encourages "invention by granting inventors a monopoly over new product designs or functions for a limited time, after which competitors are free to use the innovation." *Qualitex*, 514 U.S. at 164 (internal citation omitted).

As to the third element, likelihood of confusion, courts consider this to be the "most important element of all." *Kendall-Jackson*, 150 F.3d at 1048 (citing *Two Pesos*, 505 U.S. at 780). Given the Stan Smith and Onix shoes' similar appearances, the parties do not dispute this element.

### B.   Genericness

### (1)   Whether the Stan Smith Trade Dress is Overbroad or too Generalized

According to Skechers, adidas has failed to put forward a clear definition of its purported trade dress. Instead, adidas has defined the Stan Smith Trade Dress in general terms that would result in overbroad protection affecting a wide range of shoes currently on the market. *See Glassybaby, LLC v. Provide Gifts, Inc.*, No. C11-380 MJP, 2011 WL 4571876, at *2 (W.D. Wash. Sept. 30, 2011) (granting summary judgment that a trade dress describing small round glass containers was generic as overbroad). "A plaintiff should clearly articulate its claimed trade dress to give a defendant sufficient notice." *Sleep Sci. Partners v. Lieberman*, No. 09-04200 CW, 2010 WL 1881770, at *3 (N.D. Cal. May 10, 2010) (citing *Walker*, 549 F. Supp. 2d at 1174); McCarthy § 8:3 (same).

adidas has defined the Stan Smith Trade Dress using the following elements:

1.   a classic tennis-shoe profile with a sleek white leather upper,

2.      three rows of perforations in the pattern of the well-known Three-Stripe Mark,

3.      a defined stitching across the sides of each shoe enclosing the perforations,

4.      a raised mustache-shaped colored heel patch, which is often green, and

5.      a flat tonal white rubber outsole, as depicted below.



Pl.'s Resp. 4–5, ECF 165; Beaty Decl. ¶ 9.

Skechers employs a "divide and conquer" approach here which the Court previously rejected regarding functionality in its preliminary injunction order. *See* Op. & Order 17–18 (citing *Clicks Billiards*, 251 F.3d at 1259) ("The Ninth Circuit has repeatedly rejected this 'divide and conquer' approach to analyzing functionality[.]"). In the Ninth Circuit, courts considering trade dress look to the overall visual impression or total combination of elements as opposed to viewing each element in isolation. This holistic approach applies not only to functionality, but also to the issue of genericness. *Clicks Billiards*, 251 F.3d at 1259. The parties, nevertheless, discuss each element of the Stan Smith Trade Dress in a "tit-for-tat" fashion when addressing the issue of genericness.

//

//

(a)      A Classic Tennis-Shoe Profile With a Sleek White Leather Upper

Skechers asserts that "classic tennis-shoe profile" is a vague and empty generality. In response, adidas argues that terms like "classic," when taken alone could be considered generic but that the term is coupled with "sleek white leather upper" which "evokes a very specific shoe profile, color, and material" to avoid the pitfalls described in *Walker*. Pl.'s Resp. 20–21. adidas also argues that artistic elements like "classic" can be harder to capture in words and need to be more broadly framed. *Id.* (citing *Walker*, 549 F. Supp. 2d at 1176) (acknowledging decorative or artistic trade dress elements "may be harder to capture in words, and may need descriptors more broadly framed").

The Court agrees with Skechers that if the element was only "classic tennis-shoe profile" that it would be vague. When viewing the facts in the light most favorable to adidas, the Court should adopt its description of its own elements. As phrased above, "classic tennis-shoe profile with a sleek white leather upper" should be considered together. This element does not describe the trade dress in terms that are too indefinite, unlike the product at issue in *Walker*. In that case, the court ruled that terms referring to floor tiles, such as "rustic look," "weathered look," "architectural character," and "Old World handiwork" were too unclear to warrant protection. *Walker*, 549 F. Supp. 2d at 1176. The element here is distinguishable because it describes shape, color, and material.

As to "sleek white leather upper," Skechers argues that adidas has proposed no boundaries for this element and described many shoes which have non-sleek, non-white, and non-leather uppers as part of the Stan Smith Trade Dress. Raphael Decl. Ex. 1, at 62–64, 71–73, 87; Ex. 14, at 132–138, 147–149. Once more, this element contains descriptors of the shape, color, and material of the upper. While several of adidas' employees stated that they believed

that shoes which did not have a sleek white leather upper to be covered under the Stan Smith Trade Dress, the trade dress as defined in this lawsuit explicitly requires a "sleek white leather upper." Skechers conflates the Stan Smith Trade Dress with the Stan Smith line of products as a whole. The former refers to the classic white leather shoe with a green mustache-shaped heel patch. The latter refers to a constellation of limited edition Stan Smith spinoffs that are extremely varied. Many of those limited editions do not have the elements described above and are not covered under the Stan Smith Trade Dress. That does not mean, however, that the trade dress elements themselves are too indefinite to be protectable.

      (b)    Three Rows of Perforations in the Pattern of the Well-Known Three-Stripe Mark and a Defined Stitching Across the Sides of Each Shoe Enclosing the Perforations

Skechers does not contest the third and fourth elements of the trade dress. Beaty Decl. ¶ 9. Once more, courts consider the combination of the trade dress elements and examine the overall visual impression they present rather than looking at each element in isolation. While Skechers's Onix shoe may not share these two elements, Skechers's silence as to them undercuts its argument that the Stan Smith Trade dress—as a whole—is generic.

      (c)    A Raised Mustache-Shaped Colored Heel Patch, Which is Often Green

adidas's deponents stated that shoes with heel patches of colors other than green fell within the ambit of the Stan Smith Trade Dress. Raphael Decl. Ex. 1, at 83:5–84:5; Ex. 29, at 64:10–17, 111:1–22. For example, Brandon Beaty, adidas's Director of Sport Style Brand Marketing, testified at his deposition that when "looking at the shoe in its entirety" a shoe's heel tab could be white and it would still be covered by the trade dress. Raphael Decl. Ex. 1, at 83:5–84:5. Skechers also argues that "mustache-shaped" is vague because many shoes could be said to have a mustache-shaped heel patches. Raphael Decl. Ex. 41, at ¶¶ 114–115; Ex. 93.

The Court agrees with Skechers that the trade dress would have been more definite had adidas defined the element as "green" instead of "often green," but this does not fall to the level of generality prohibited by *Walker*. In *Walker*, the element described a "palette of colors reminiscent of Provence" as opposed to simply " often green." 549 F. Supp. 2d at 1176. Here, the trade dress as a whole describes the "classic" Stan Smith shoe, which evokes a particular shade of green. This element describes color and shape which is sufficient to survive this preliminary hurdle. The fact that other shoes have heel patches, some of which are also mustache-shaped, does not make this element too indefinite to put competitors on notice.

(d)    A Flat Tonal White Rubber Outsole, as Depicted Below

Skechers argues that "tonal" means nothing other than the outsole color must be the same color as the upper. Raphael Decl. Ex. 29, at 117:2–4. adidas's employees have stated that they consider shoes with similarly toned outsoles to fall within the Stan Smith Trade Dress as long as they are "close enough to the eye, visually." *Id.* at 117:2–15; Ex. 14 at 150:22–152:23. Once more, adidas responds that this element provides "precise details as to the outsole's color, shading, texture, shape, and material." Pl.'s Resp. 20. The Court agrees. It is unclear what heightened level of specificity a single element must be described with in order to satisfy Skechers. The element describes a: "flat (shape) tonal white (color) rubber (material) outsole (component)." Furthermore, this element expressly includes a photograph of what it describes. Accordingly, this element is described with sufficient specificity to survive an attack based on indefiniteness.

(e)    The Stan Smith Trade Dress Elements Considered as a Whole

In sum, the question is whether the total combination of the elements is overbroad and indefinite such that the trade dress is generic and fails to provide competitors with sufficient

notice of what is protected. Skechers makes no such argument as to the trade dress in toto. At the

very least, adidas has raised genuine factual disputes regarding several of the elements,

especially those that Skechers does not discuss. When viewing the facts in the light most

favorable to adidas, Skechers has not demonstrated that the Stan Smith Trade Dress is indefinite

and therefore generic.

### (2)   Is the Mark so Common to the Industry That it Cannot be Said to Identify a Particular Source

Skechers's next argument also asserts that the Stan Smith Trade Dress is generic under

the third *Walker* prong. Once more, *Walker* provides that a product may be generic if "the design

is so common in the industry that it cannot be said to identify a particular source." 549 F. Supp.

2d at 1174. "[T]he fact that a similar trade dress is already being used by manufacturers of other

kinds of products, may indicate that the trade dress is no more than a concept or idea to be

applied to particular products." *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27,

33 (2d Cir. 1995). Skechers argues that adidas's "pliable definition claims a shoe design that is

common in the footwear industry." Def.'s Mot. Summ. J. 34. To support this argument, it

provides several tables containing pictures of shoes manufactured by third-parties which share

elements with the Stan Smith Trade Dress. *Id.* at 34–36. Skechers urges the court to "reject

adidas' attempt to 'monopolize basic product designs' with its overbroad trade dress definition."

*Id.* at 37 (quoting *Big Island Candies, Inc. v. Cookie Corner*, 269 F. Supp. 2d 1236, 1249 (D.

Haw. 2003)).

Once more, Skechers succumbed to analyzing each element in isolation. The Ninth

Circuit explained the proper focal point for the analysis is the combination of elements:

> We emphasize here that, in evaluating functionality as well as the
> other elements of a trade dress claim, it is crucial that we focus not
> on the individual elements, but rather on the overall visual

> impression that the combination and arrangement of those elements create. Trade dress is the composite tapestry of visual effects. Courts have repeatedly cautioned that, in trademark-and especially trade dress-cases, the mark must be examined as a whole, not by its individual constituent parts.

*Clicks Billiards*, 251 F.3d at 1259. Skechers has not shown that third-party competitors regularly produce shoes sharing a common design with the Stan Smith Trade Dress. Instead, Skechers produces evidence of shoes sharing some element of the trade dress. This approach is at odds with well-established trademark law. Skechers also produced two tables purporting to contain third-party shoes with all of the Stan Smith Trade Dress elements except the Three-Stripe Mark. *See* Def.'s Reply 8–9, Tables 1 & 2, ECF 178. Those third-party shoes, however, do not demonstrate that the Stan Smith design is common to the industry given adidas's evidence that those shoes sold in very low volumes. *See* Henn Resp. Decl. Ex. 62. Accordingly, the Court finds that adidas has created genuine factual disputes as to whether third-party shoes share all of the elements of the Stan Smith Trade Dress and whether those shoes were produced and sold in sufficient volumes to render the trade dress generic as a matter of law. Therefore, the Court denies Skechers's motion for summary judgment as to the Onix based on genericness.

### C.     *Whether the Stan Smith Trade Dress Has Acquired Distinctiveness Through Secondary Meaning*

Skechers also moves for summary judgment on adidas's claims against the Onix shoe on the basis that the trade dress is indistinct. As outlined above, the first element of an infringement claim brought under § 43(a) is distinctiveness. *See Kendall-Jackson*, 150 F.3d at 1047. A trademark can either be inherently distinctive or it can establish distinctiveness through secondary meaning. The parties do not dispute inherent distinctiveness. "The Supreme Court has held that . . . trade dress that is a design of a product can never be inherently distinctive and can only be registered or protected on a showing of secondary meaning." McCARTHY § 15:1 (citing

*Qualitex*, 514 U.S. at 163). Accordingly, the issue before the Court is whether adidas can establish that the Stan Smith Trade dress has acquired distinctiveness through secondary meaning.

A mark acquires secondary meaning when, "in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself." *Wal-mart*, 529 U.S. at 211 (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.11 (1982)); *see also Miller v. Glenn Miller Prods. Inc.*, 454 F.3d 975, 992 (9th Cir. 2006) ("Secondary meaning is the consumer's association of the mark with a particular source or sponsor."). "Secondary" does not denote a lesser form of distinctiveness; rather, it refers to meaning acquired second in time. MCCARTHY § 15:1. "[A] showing of secondary meaning only requires proof that the public associates the [trade dress] with a single source, even if that source is anonymous." *Maljack Prods. Inc. v. GoodTimes Home Video Corp.*, 81 F.3d 881, 887 (9th Cir. 1996). McCarthy describes secondary meaning as "a place on a scale of recognition—a particular amount of trademark strength. This is analogous to a particular point on a scale of measurement, such as 'boiling point of water' or 'passing grade,' or 'credits needed for graduation.'" MCCARTHY § 15:1. Whether a particular trade dress has acquired secondary meaning is a question of fact. *Clicks Billiards*, 251 F.3d at 1262.

Courts apply a well-established six-factor test for secondary meaning, including: (1) whether actual purchasers associate the dress with the source, which can be shown through customer surveys; (2) the degree and manner of advertising by the party seeking protection; (3) the length and manner of use of the dress; (4) whether the use by the party seeking protection has been exclusive; (5) sales success of the trade dress; and (6) attempts by others to imitate. *Adidas-Salomon AG v. Target Corp.*, 228 F. Supp. 2d 1192, 1207 (D. Or. 2002).

OPINION & ORDER - 19

At the preliminary injunction stage, the Court found that adidas was likely to succeed in showing that the Stan Smith Trade Dress had acquired distinctiveness through secondary meaning. Op. & Order 16. The evidence which supported that decision remains persuasive for purposes of the parties' motions currently before the Court. The Court will discuss the six elements identified above.

> (1)  *Whether Actual Purchasers Associate the Dress with the Source, Which Can be Shown Through Customer Surveys*

Skechers's primary argument against secondary meaning rests on this factor. Skechers asserts that adidas cannot show secondary meaning because it has failed to conduct any coustomer surveys. Skechers further argues that its own customer survey affirmatively proves that the Stan Smith Trade Dress has not acquired distinctiveness through secondary meaning.

The Ninth Circuit recognizes that "[a]n expert survey of purchasers *can* provide the most persuasive evidence of secondary meaning." *Vision Sports*, 888 F.2d at 615 (citing *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1358 (9th Cir. 1985) (emphasis added)). "[D]irect survey evidence of purchaser perception is not required" to successfully demonstrate secondary meaning. *Art Attacks Ink, LLC v. MGA Entm't Inc.*, 581 F.3d 1138, 1145–46 (9th Cir. 2009) (citing *Clamp Mfg. Co. v. Enco Mfg. Co.*, 870 F.2d 512, 517 (9th Cir.1989)); *see also* MCCARTHY § 15:30 ("However, survey data is not a requirement and secondary meaning can be, and most often is, proven by circumstantial evidence."); *Comm. for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 822 (9th Cir. 1996) ("[S]urvey evidence is only one of the most persuasive ways to prove secondary meaning, and not a requirement for such proof.").

According to Skechers, adidas's failure to conduct any customer survey despite ample time to do so is dispositive of whether the Stan Smith Trade Dress has achieved secondary meaning. Skechers asserts that adidas has not conducted such surveys because it knows that the

results will be unfavorable for it. Moreover, Skechers's expert, Sarah Butler, conducted a consumer survey and found that consumers "do not associate the combination of elements claimed to make up the 'Stan Smith' trade dress with one brand of sneaker." Raphael Decl. Ex. 36, at ¶ 41. Butler's survey found that the net rate of association between the trade dress and one brand was 4%. *Id.* at ¶ 42.

The Court concluded at the preliminary injunction stage that "adidas has provided ample and convincing circumstantial evidence of secondary meaning, obviating the need for a consumer survey." Op. & Order 16. Once more, the Court finds that adidas has produced strong circumstantial evidence that purchasers associate the Stan Smith Trade Dress with a single source. adidas produced evidence that the Stan Smith has been widely recognized as an iconic shoe over the course of decades. It has garnered accolades such as a "classic of design," the "ultimate fashion shoe," and "The Most Important Sneaker of All-Time." Beaty Decl. Ex. B, at 1; Ex. C, at 24, 27, 30. Beaty testified at the preliminary injunction hearing that when "people identify with this shoe, we believe they're identifying with our brand as well." Transcript of Oral Argument at 43. The record demonstrates that adidas has at least created a genuine factual issue to survive summary judgment. *See Brighton Collectibles, Inc. v. Coldwater Creek, Inc.*, No. 06-CV-1848 H(POR), 2008 WL 2120500, at *7 (S.D. Cal. May 20, 2008) (concluding that where the plaintiff criticized the defendant's survey and produced other evidence of secondary meaning the court found that a genuine triable issue had been raised).

adidas has also raised a factual dispute as to whether Skechers's survey is deficient. Specifically, that the survey: (1) used control stimuli that artificially reduced secondary meaning results; (2) used an over-inclusive universe; and (3) used improper instructions and questions. Transcript of Oral Argument at 137–147. adidas's expert, Dr. Itamar Simonson, found that the

survey was over-inclusive regarding the price range it posed to consumers: $20–200. Henn Resp.

Decl. Ex. 85, at ¶ 11. Simonson also found that Butler failed to eliminate Stan Smith Trade Dress

features from the control subject. *Id.* at ¶¶ 12–13.

Skechers has not demonstrated that it is entitled to summary judgment that the Stan Smith

Trade Dress is indistinct based on adidas's lack of a survey and the strength of its own survey.

Given that the Court previously found that adidas had produced enough circumstantial evidence

to obviate the need for a survey, Skechers is faced with a high burden of overcoming that

evidence under the summary judgment standard. adidas's rebuttal of Butler's survey also raises

serious questions as to its accuracy. Furthermore, this factor is not dispositive of whether the

trade dress has demonstrated secondary meaning.

### (2)    The Degree and Manner of Advertising of the Trade Dress

Skechers argues that adidas's purported advertising evidence does not support the

existence of secondary meaning. Demonstrated significant advertising expenditures related to the

trade dress at issue is evidence of secondary meaning. *Duncan McIntosh Co. v. Newport Dunes

Marina LLC*, 324 F. Supp. 2d 1078, 1084 (C.D. Cal. 2004), *aff'd*, 120 F. App'x 119 (9th Cir.

2005). In a previous trademark case involving adidas in this District, Judge King found that

"adidas' substantial advertising and promotional efforts are significant evidence of the strength

of its mark." *adidas-Am., Inc. v. Payless Shoesource, Inc.*, 546 F. Supp. 2d 1029, 1056 (D. Or.

2008) (citing *Yost*, 92 F.3d at 822).

adidas has produced substantial evidence of its advertising and promotional efforts

regarding Stan Smith. For example, adidas has spent tens of millions of dollars promoting the

shoe since its creation. Beaty Decl. ¶ 11; Beaty Supp. Decl. ¶¶ 17–19. adidas has also produced

evidence of extensive media coverage of the Stan Smith shoe. Beaty Decl. ¶ 14, Ex. C; Beaty

OPINION & ORDER - 22

Supp. Decl. ¶¶ 10–13. In particular, adidas discussed the success of its "hype" executions which are limited runs of footwear that play off of the classic design. Beaty Supp. Decl. ¶¶ 21–22. These "hype" executions make up a small fraction of sales but generate a lot of market "buzz," increasing overall demand for Stan Smith shoes. Transcript of Oral Argument at 44:21–56:11; 75:11–23; Beaty Supp. Decl. ¶¶ 21–22, Ex. N. In addition, the Stan Smith has been displayed by influential actors, musicians, and athletes. Beaty Supp. Decl. ¶ 6, Exs. A, B; Transcript of Oral Argument at 47:19–48:9. The record contains many more examples of promotions related to the Stan Smith, such as industry praise in newspapers and magazines, social media platform use, and advertising prominently featuring the key elements of the trade dress. In adidas's view, all of this amounts to tens of millions of dollars spent on hard to quantify and non-traditional forms of advertisement all directed towards establishing the Stan Smith Trade Dress.

This factor weighs heavily in adidas's favor. Skechers's arguments that adidas has failed to show what impact these advertisements have had on customers is unavailing. The "degree and manner" of adidas's advertising of the Stan Smith shoe is vast and varied.

> (3)   *The Length and Manner of Use of the Dress & Whether the Party Seeking Protection Has Used the Trade Dress Exclusively*

Skechers does not make any argument expressly targeting the third factor, but it does assert that third-party production of shoes bearing Stan Smith Trade Dress elements show that adidas has not used the trade dress exclusively. adidas, by contrast, discussed both factors together. "[T]hird party use of one or more suggestive or arbitrary elements of a plaintiff's trade dress renders that trade dress indistinct only if the third party use is so extensive and so similar to the plaintiff's that it impairs the ability of consumers to use the trade dress of the products to identify their source." *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1537 (11th Cir. 1986); *Carter-Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 802 (9th Cir. 1970) (finding that a lack of

exclusivity based on third party use weighs against a finding of secondary meaning). "Isolated or

piecemeal third party uses of various elements of the . . . trade dress do not detract from the

distinctiveness of the overall impression conveyed by the combination of those elements. . . ."

*AmBrit, Inc.*, 812 F.2d at 1537.

adidas asserts that it has exclusively used the trade dress since the 1970s. Beaty Decl. ¶ 8;

Transcript of Oral Argument at 43:3–5. adidas argues that the shoes Skechers identified sold

very few units during brief time periods, and unlike the Onix, none of them closely copied all of

the asserted elements. Henn Resp. Decl. Ex. 62; Ex. 66, at ¶¶ 89–90; Op. & Order 15 n.3.

Furthermore, Skechers has not provided other relevant information regarding these third-party

shoes such as where the shoes were sold and whether adidas was aware of them or had taken

action against them. *See Zobmondo Entm't v. Falls Media*, 602 F.3d 1108, 1119 (9th Cir. 2010)

(denying summary judgment because the defendant's evidence of third-party use did not account

for sales figures and distribution locations).

On balance, these two factors weigh in favor of adidas. As to length and manner of use,

Skechers does not dispute adidas's assertions that it has heavily used the Stan Smith Trade Dress

since 1972. As to exclusivity, Skechers's evidence of third-party use is weak. As discussed

above, most of the third-party shoes that Skechers identified sold very few pairs, some in the

single and double-digits. *See* Henn Resp. Decl. Ex. 65. Such third-party use is piecemeal and

insufficient to render adidas's use of the trade dress non-exclusive as a matter of law.

(4)     *Sales Success of the Trade Dress*

Next, Skechers argues that adidas's claimed sales success figures are misleading and not

probative of secondary meaning. While sales success of the trade dress can be evidence of

secondary meaning, "[e]vidence which merely shows that a product is popular is not probative of

secondary meaning." MCCARTHY § 15:47. "Raw sales figures need to be put into context to have any meaning." *Id.* at § 15:49.

Skechers's position is that adidas inflated its sales figures and that the sales it did report reflect the brand's popularity rather than Stan Smith's popularity. Specifically, Skechers argues that adidas's claim that it has sold 40 million pairs of Stan Smith shoes worldwide is over inclusive; rather, it has only sold roughly 700 thousand pairs during the relevant period in the United States. Def.'s Mot. Summ. J. 38. In Skechers's view, only sales of the Stan Smith during the period of the alleged infringement are relevant. *Id.* at 38 n.10.

adidas provides evidence that it has globally sold 40 million pairs of Stan Smiths since 1972. Henn Resp. Decl. Ex. 39, at 10–12; Exs. 42, 43. adidas also cites to more recent sales figures showing that between January of 2014 to September of 2015, it sold approximately 430 thousand pairs of shoes bearing the Stan Smith Trade Dress in the United States. Beaty Supp. Decl. ¶ 19. It further calculated that it sold 700 thousand pairs during 2014 and 2015. Henn Resp. Decl. Ex. 40. adidas's commercial success with the Stan Smith Trade Dress is undeniable and further supports its claim for acquired distinctiveness established through secondary meaning.

### (5)   *Attempts by Others to Imitate*

In its motion, Skechers skips this factor entirely. adidas's evidence shows that Skechers admitted that it set out to clone the Stan Smith shoe. "[E]vidence of deliberate copying is relevant to a determination of secondary meaning. Indeed, in appropriate circumstance, deliberate copying may suffice to support an inference of secondary meaning." *Clicks Billiards*, 251 F.3d at 1264 (internal citation omitted); *see also Vision Sports*, 888 F.2d at 615 ("[W]e have held that proof of copying strongly supports an inference of secondary meaning."). The Ninth Circuit has also stated that "[p]roof of exact copying, without any opposing proof, can be

sufficient to establish secondary meaning [since] '[t]here is no logical reason for the precise

copying save an attempt to realize upon a secondary meaning that is in existence.'" *Target*, 228

F. Supp. 2d at 1209 (quoting *Transgo*, 768 F.2d at 1016).

Skechers's Rule 30(b)(6) witness testified that the company's CEO Robert Greenberg

likely gave the order to produce a knock-off Stan Smith. Henn Resp. Decl. Ex. 17, at 5. Skechers

used code words to mask its activities such as "Stan Smi$h," "s$tan S8th," and "SB" for "Store

Bought." Henn Resp. Decl. Ex. 19; Ex. 63, at 4–5; Ex. 64. adidas produced a particularly

persuasive picture showing a Skechers's employee holding its prototype shoe on top of a Stan

Smith shoe with detailed instructions on how to transform the former into the latter. Henn Resp.

Decl. Ex. 20, at 8; Ex. 36, at 194–217; Ex. 38. Those instructions were precise: "increase the

sidewall height by 2mm," "reference the [Stan Smith] to have much less bulbous toe cap," and

"change the tongue construction to follow the [Stan Smith]." *Id.* James Callahan, the designer of

the Onix, testified that the instructions above were carried out to make exact copies of the Stan

Smith. Henn Resp. Decl. Ex. 36, at 216:21–217:11. Skechers's attorney admitted at oral

argument "[t]hat Skechers set out to make a competitive Skecherized version of [the Stan Smith]

shoe is not denied and is not disputed and never has been. There is also no question that the

direction to do this came from Mr. Greenberg, Skechers' CEO." Henn Resp. Decl. Ex. 65, at 4.

Indeed, the Court found that the Onix and Stan Smith gave the "unmistakable overall

impression" of "two nearly identical Shoes." Op. & Order 14.

In response, Skechers argues that its copying was legal. "Trade dress protection must

subsist with the recognition that in many instances there is no prohibition against copying goods

and products." *Trafix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 29 (2001). "It must

also not be forgotten that there is absolutely nothing legally or morally reprehensible about exact

copying of things in the public domain." MCCARTHY § 15:38. Skechers implies, without asserting outright, that it may have had other reasons for copying Stan Smith's traits, for example, in response to changing consumer preferences. Def.'s Reply 16.

This factor alone is sufficient to deny Skechers's motion for summary judgment that the Stan Smith Trade Dress is indistinct. Furthermore, this factor weighs heavily in adidas's favor as Skechers has produced no evidence rebutting the clear evidence of its meticulous efforts to copy the Stan Smith shoe. Skechers provides no factual support for the position that its copying was legal or that it had other reasons for copying the Stan Smith other than to profit from adidas's trade dress precisely because it has acquired secondary meaning.

On balance, adidas has a very strong case that the Stan Smith Trade Dress has acquired distinctiveness through secondary meaning. Certainly, Skechers has fallen short of proving that it is entitled to summary judgment that the Stan Smith Trade Dress is indistinct. While adidas's lack of consumer survey evidence does cut against it, adidas has produced sufficient circumstantial evidence and otherwise made showings as to the remaining elements sufficient for the Court to infer secondary meaning. Accordingly, Skechers's motion is denied.

### D.    *Functionality Defense*

adidas moves for summary judgment on Skechers's affirmative defense that the Stan Smith Trade Dress is functional and therefore unprotectable. "The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature." *Qualitex*, 514 U.S. at 164. Control over functional features is governed by patent law, which is designed to "encourage invention by granting investors a monopoly over new product designs or functions for a limited time, after which competitors are free to use the innovation."

*Id.* (internal citation omitted). It is important to guard against the overlap of patents and trademarks because if a product's functional features could be trademarked, the holder could obtain a monopoly "over such features . . . without regard to whether they qualify as patents and could be extended forever (because trademarks may be renewed in perpetuity)." *Id.* at 164–65 (citations omitted).

"Functional features of a product are features which constitute the actual benefit that the consumer wishes to purchase, as distinguished from an assurance that a particular entity made, sponsored, or endorsed a product." *Target*, 228 F. Supp. 2d at 1202 (quoting *Rachel v. Banana Republic, Inc.*, 831 F.2d 1503, 1506 (9th Cir. 1987)). "In general terms, a product feature is functional, and cannot serve as a trademark, if it is essential to the use or purpose of the article or if it affects the cost or quality of the article, that is, if the exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." *Id.* (quoting *Qualitex*, 514 U.S. at 165 (internal quotation marks omitted)). Although courts in the past have also asked whether the trade dress is "aesthetically functional," the Ninth Circuit (the circuit from which the doctrine originated) has all but abandoned that question as the true test for functionality. *Id.* (citing *Clicks Billiards*, 251 F.3d at 1260). Instead, the Ninth Circuit considers four functionality factors: "(1) whether the design yields a utilitarian advantage, (2) whether alternative designs are available, (3) whether advertising touts the utilitarian advantages of the design, and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture." *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*, 158 F.3d 1002, 1006 (9th Cir. 1998) (citing *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 823 (9th Cir. 1993)).

At the preliminary injunction stage, the Court rejected Skechers's "divide and conquer" approach to functionality and found that the claimed features of the Stan Smith Trade Dress,

when analyzed as a whole, were not functional. Op. & Order 17–19; *see also Clicks Billiards*, 251 F.3d at 1259 (stating that courts must "focus not on the individual elements, but rather on the overall visual impression that the combination and arrangement of those elements create"); *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 842 (9th Cir. 1987) ("[O]ur inquiry is not . . . whether individual elements of the trade dress fall within the definition of functional, but . . . whether the whole collection of elements taken together are functional."). The Court will discuss each of the four *Disc Golf* factors outlined above.

       *(1)     Whether the Design Yields a Utilitarian Advantage*

adidas's position is that the Stan Smith was once considered a performance tennis shoe when it was first created in 1972, but times have changed and over the course of forty-five years, the shoe no longer yields any utilitarian advantage. Its features which were functional then, now serve a source-identifying function. *See Target*, 228 F. Supp. 2d at 1195, 1205 (finding that "functionality is a fact-specific status that may change over time" and that adidas's trade dress at issue which was a "performance basketball shoe" in 1969, was "optimal no longer" and therefore non-functional). Moreover, adidas argues that even if some of the features were functional, that the trade dress as a whole is not.

Skechers points to two expired utility patents drafted by adidas's founder Adolf "Adi" Dassler in the 1970s. In those patents, adidas's founder shows that perforations on the side panels of a shoe improve ventilation and flexibility and heel patches act as "achilles' tendon pads" improving comfort and support. Raphael Resp. Decl. Ex. 21, at 1:26–32; Ex. 22, at 1:62–2:3; Ex. 23, at 4:50–52, Fig 6. Skechers argues that these elements constitute utilitarian advantages and that the Ninth Circuit has never embraced the proposition that the product must have a utilitarian advantage that is superior to the past.

OPINION & ORDER - 29

This factor favors adidas. Skechers, once again, used the prohibited "divide and conquer" approach. Skechers makes no attempt to argue that the trade dress, as a whole, offers utilitarian advantages other than to say the shoe is known for its comfort. The shoe's comfort is due to its internal qualities, such as its synthetic mesh lining and raised collar. The trade dress's heel patch is stitched to the outside of the shoe and is a distinct feature from the raised collar which does improve comfort. In any event, courts in this District have twice held that an adidas's trade dress had become non-functional despite evidence that it had once been functional. *See Target*, 228 F. Supp. 2d at 1198; *Payless*, 529 F. Supp. 2d at 1266.

     *(2)    Whether Alternative Designs Are Available*

adidas points out that Skechers's briefing includes a host of example third-party retro tennis sneakers incorporating Stan Smith's elements. Roach Decl. ¶¶ 9–10, Ex. B. In its response, Skechers proves too much by arguing that adidas's examples of alternative designs are insufficient and furnishing its own examples of alternative designs. The Court previously found that such examples affirmatively demonstrate the availability of alternative designs. Many design alternatives were available to Skechers given the numerous examples of retro white leather sneakers it produced in its briefing. Instead of adopting one of those alternatives, Skechers elected to design a shoe which deliberately cloned the Stan Smith down to the millimeter. Therefore, this factor also favors adidas.

     *(3)    Whether Advertising Touts the Utilitarian Advantages of the Design*

The Stan Smith shoe is advertised as a clean, simple shoe and it has been described as a "style staple." Naderi-Nejad Decl. ¶ 11, Ex. C. This shoe has been worn by numerous celebrity superstars as a fashion statement and is not marketed as an athletic shoe. *Id.* at ¶ 12, Ex. D; Beaty Supp. Decl. ¶¶ 9–11, Exs. D–F. Skechers responds that third-party retailers have referenced the

shoe's added breathability and comfort. Raphael Resp. Decl., Exs. 26, 30, 31. This argument is
unavailing as third-party advertisements discuss the shoe's elements in isolation and do not
attribute utilitarian advantages to the trade dress design as a whole. The majority of Stan Smith
related advertising heavily focuses on the shoe's iconic style rather than any utilitarian
advantages. Accordingly, this factor favors a finding of non-funcitonality.

   (4)  *Whether the Particular Design Results from a Comparatively Simple or*
      *Inexpensive Method of Manufacture*

   adidas asserts that it does not use the trade dress for manufacturing-related advantages.
Naderi-Nejad Decl. ¶¶ 13–14. The Court previously found that no utilitarian advantage was
gained from the trade dress's features "because they do not make the shoe work better or cost
less than other similar sneakers in the current marketplace." Op. & Order 18. Skechers argues
that adidas has produced no evidence that the Stan Smith did not result from a relatively simple
or inexpensive manufacturing process. Rather, the Stan Smith is inexpensive and simple to make
when compared with adidas's performance shoes. Naderi-Nejad Decl. ¶ 9, Ex. C at 1 (comparing
Stan Smith's $75 price tag with the Barricade Boost's $160 price). While the Stan Smith may be
cheaper and less-complex to manufacture than high-performance shoes, its manufacturing costs
and complexities may be commensurate with other shoes of its class. The parties give this factor
short shrift and the Court accords it little weight. This factor is neutral.

   In sum, the *Disc Golf* factors weigh in favor of finding that the Stan Smith Trade Dress is
nonfunctional. Skechers's prohibited "divide and conquer" approach to the first factor as well as
its weak evidence as to the other three factors do not raise a genuine dispute of material fact as to
the trade dress's functionality. Skechers's critical failure is its inability to articulate how the trade
dress—as a whole—is functional. Instead, it relies on expired patents to argue in a general
fashion that perforations and raised collars increase comfort. Skechers's self-defeating evidence

as to design alternatives and weak advertising evidence are also insufficient to raise a genuine

factual dispute as to the functionality of the trade dress as a whole. Accordingly, the Court grants

summary judgment to adidas on Skechers's functionality defense.

## II.    **adidas's Three-Stripe Mark and Skechers's Cross Court Shoe**

Skechers moves for summary judgment on adidas's claims that the Cross Court shoe

infringes the Three-Stripe Mark. Specifically, Skechers argues that adidas cannot establish a

likelihood of confusion or dilution. Likelihood of confusion is analyzed under the well-

established eight *Sleekcraft* factors. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 346 (9th Cir.

1979). Skechers's dilution argument follows a similar multi-factored test as well. adidas, by

contrast, only moves for summary judgment declaring that the parties' 1995 Agreement has not

been superseded by subsequent settlements and remains valid.

### A.    *Likelihood of Confusion*

The Court previously found that adidas had made a strong showing that Skechers's Cross

Court shoe was likely to confuse consumers about the source of the product. *See* Op. & Order 31.

Now, Skechers moves for summary judgment that adidas cannot establish consumer confusion.

The eight *Sleekcraft* factors present a highly factual analysis and in light of this Court's

preliminary injunction ruling and the parties' voluminous summary judgment exhibits, Skechers

faces a high burden of demonstrating that no genuine factual dispute exists when viewing the

evidence in the light most favorable to adidas.

"In the Ninth Circuit, neither an intent to confuse, nor actual confusion are required

elements of a trademark infringement claim." *Payless*, 546 F. Supp. 2d at 1051 (citing *Coca–*

*Cola Co. v. Overland, Inc.*, 692 F.2d 1250, 1256 n.16 (9th Cir. 1982)). The key question is

whether the two marks are sufficiently similar that a "reasonably prudent consumer in the

marketplace is likely to be confused as to the origin of the good or service bearing one of the

marks." *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998)

(internal quotation marks omitted). Courts evaluate the likelihood of confusion by examining the

"total effect of the defendant's product and packaging on the eye and mind of an ordinary

purchaser." *Payless*, 546 F. Supp. 2d at 1052 (quoting *First Brands Corp. v. Fred Meyer, Inc.*,

809 F.2d 1378, 1383–84 (9th Cir. 1987)).

Consumer confusion can arise in a variety of contexts including point-of-sale (confusing

the source at the time of purchase), post-sale (confusing someone other than the purchaser), and

even "initial interest" (using a confusingly similar mark to capture a buyer's attention). *Internet*

*Specialties W., Inc. v. ISPWest*, No. CV05-3296 FMC (AJWx), 2006 WL 4568053, at *3 (C.D.

Cal. Aug. 2, 2006); *Target*, 228 F. Supp. 2d at 1211–12 (citations omitted). No matter the type of

confusion alleged, courts in the Ninth Circuit analyze eight factors, commonly called the

"*Sleekcraft* factors," to evaluate the likelihood of confusion:

> (1) the similarity of the marks; (2) the relatedness or proximity of
> the two companies' products or services; (3) the strength of the
> registered mark; (4) the marketing channels used; (5) the degree of
> care likely to be exercised by the purchaser in selecting goods; (6)
> the accused infringers' intent in selecting its mark; (7) evidence of
> actual confusion; and (8) the likelihood of expansion in product
> lines.

*Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936, 942 (9th Cir. 2002) (citing

*Sleekcraft Boats*, 599 F.2d at 346); *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*, 109

F.3d 1394, 1404 (9th Cir. 1997) (explaining that the *Sleekcraft* factors are used "in all trademark

infringement cases."). Despite its universal application, the *Sleekcraft* factor test is not a rigid

one, and "[o]ther variables may come into play depending on the particular facts presented."

*Sleekcraft*, 599 F.2d at 348 n.11; *see also Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135,

1141 (9th Cir. 2002) ("Thus, we do not decide whether confusion is likely by considering mechanically the number of *Sleekcraft* factors that weigh in favor of either party, or by giving the same weight to a particular factor from case to case.").

The following analysis of the *Sleekcraft* factors is for summary judgment purposes only and does not narrow the issues that the factfinder will be presented with should this case proceed to trial. Once more, because Skechers is moving for summary judgment, the Court views the facts in the light most favorable to adidas.

### (1)    Similarity of the Marks

Skechers argues that the Cross Court's "E" design does not resemble the Three-Stripe Mark. The Three-Stripe mark describes three stripes on the side of a shoe that are parallel, unconnected, and of equal thickness. Compl. ¶– 25–30 62; Henn Resp. Decl. Ex. 8. Skechers describes the "E" design as "a piece of dark colored fabric on the side panel that extends from the sole of the shoe to the eyebrow and vaguely resembles a sideways 'E'". Def.'s Mot. Summ. J. 6. "The first *Sleekcraft* factor—the similarity of the marks—has always been considered a critical question in the likelihood-of-confusion analysis." *Payless*, 546 F. Supp. 2d at 1052 (quoting *GoTo.Com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000)). "[T]he greater the similarity between the two marks at issue, the greater the likelihood of confusion." *Id.* at 1052 (quoting *GoTo.Com*, 202 F.3d at 1206). The Ninth Circuit has "developed three axioms that apply to the similarity analysis: 1) Marks should be considered in their entirety and as they appear in the marketplace; 2) Similarity is best adjudged by appearance, sound, and meaning; and 3) Similarities weigh more heavily than differences." *Entrepreneur Media*, 279 F.3d at 1144.

The "critical differences" between the two marks, in Skechers view, is that the "E" design "is a single piece of fabric with three non-parallel lines of unequal and varying thickness that

combine halfway down the shoe to form a chevron shape, which runs diagonally to the sole of the shoe." Def.'s Mot. Summ. J. 15. Skechers also argues that the "E" design's edges are rounded whereas the Three-Stripe Mark's edges are sharp. *Id.* In the preliminary injunction order, the Court considered these arguments and found that Skechers pointed to only "minor distinctions" between the marks and that they did "not change the overall impression of similarity between" them. Op. & Order 22. The Court remains unpersuaded by Skechers renewed argument on this point.

Skechers also argues that the "E" design must be viewed as it appears in the marketplace. *One Indus., LLC v. Jim O'Neal Distrib., Inc.*, 578 F.3d 1154, 1165 (9th Cir. 2009). According to Skechers, the "E" design must be viewed along with its "S" logo which has strong brand recognition. Skechers's "S" logo appears in six places on the Cross Court, including the sides of the shoe just below the "E" design and towards the shoe's heel. Def.'s Mot. Summ. J. 6, Table. 1. In response, adidas argues that the "S" logo on the side of the Cross Court is often covered up by the wearer's pant leg and it looks like the Three-Stripe Mark when viewed from above. Pl.'s Resp. 31; Raphael Decl. Ex. 61, at 15–17; Ex. 74. These images show that Skechers labeling is imperceptible in multiple post-sale contexts and that the overall impression of the shoe resembles the Three-Stripe Mark.

This factor is neutral. When viewing the shoe in a pre-sale context, Skechers's logos are clearly visible and the "E" design does not appear similar to the Three-Stripe Mark. In post-sale photographs where the Cross Court is being worn with pants, however, the "E" design appears to be very similar to the Three-Stripe Mark. The parties have raised a genuine dispute as to whether the marks are similar when the Cross Court shoe is viewed in its entirety.

//

*(2)        Relatedness or Proximity of the Goods*

Given Skechers's serialized branding of the Cross Court shoe, it argues that this factor is

at best neutral because the product is clearly labeled despite being in close proximity with

adidas's shoes bearing the Three-Stripe Mark. The Court previously found that this factor

strongly weighed in adidas's favor. Op. & Order 23. The relatedness and proximity of the goods

are undeniable. The products are "reasonably interchangeable by buyers for the same

competitive purpose." McCarthy § 24:23. In other cases involving shoes, courts in this District

found that the parties' products were "essentially identical in use and function," *Payless*, 546 F.

Supp. 2d at 1054, and that this factor favored adidas where the infringing product used a similar

design on a nearly identical product. *Target*, 228 F. Supp. 2d at 1213. Discovery has not changed

the products' relatedness or proximity and this factor continues to strongly favor adidas.

*(3)        Marketing Channels Used*

Skechers's shoes are sold in company-owned Skechers retails stores as well as third-party

retail stores. Kartalis Decl. ¶ 4, ECF 52; Raphael Decl. Ex. 38, at ¶ 39; Ex. 32, at 55–56. At the

preliminary injunction stage, the Court was persuaded by adidas's evidence showing that

Skechers's shoes could be found at the same stores as adidas's shoes. Op. & Order 24; Murphy

Decl. ¶ 22; Beaty Decl. ¶ 18. Courts "consider where the goods or services are sold, the sales and

marketing methods employed, and the class of purchasers exposed to the marketing efforts."

*LaQuintana Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 876–77 (9th Cir. 2014).

The parties sell shoes at the same stores, such as Finish Line, Macy's, Dillards, Kohl's, Famous

Footwear, and specialty running stores. Pl.'s Resp. 34; Henn Resp. Decl. Ex. 17, at 54:24–55:8.

The parties also sell shoes through the same ecommerce websites such as amazon.com. Henn

Resp. Decl. Ex. 16, at 13:6–13; Ex. 16, at 191:14–17; Ex. 44, at 45:3–6. Accordingly, the Court

finds that this factor favors adidas.

> (4)    *Strength of the Senior Mark*

To rule that adidas's famous Three-Stripe Mark is anything but strong would reverse this

Court's previous ruling and would ignore the rulings of other courts considering the same mark.

"The scope of protection afforded a trademark 'depends upon the strength of the mark, with

stronger marks receiving greater protection than weak ones.'" *Payless*, 546 F. Supp. 2d at 1055

(quoting *Entrepenuer Media*, 279 F.3d at 1141). Strength is measured both in terms of

conceptual and commercial strength. *GoTo.com*, 202 F.3d at 1207. Conceptual strength is

assessed "along a spectrum of increasing distinctiveness. From weakest to strongest, marks are

categorized as generic, descriptive, suggestive, and arbitrary or fanciful." *Id.* (internal citation

omitted). The Court previously found that the Three-Stripe Mark is conceptually strong because

it is arbitrary. Op. & Order 25 (citing *adidas-Salomon AG v. Target Corp.*, Civ. No. 01-1582-RE,

2003 WL 25710435, at *6 (D. Or. Jan 29, 2003) ("The adidas three-stripe marks are arbitrary

because three stripes do not define, describe or suggest the various products that bear them.").

Furthermore, the Court remains persuaded that the Three-Stripe mark is commercially strong

given adidas's evidence of billions of dollars in sales of products bearing the mark. Other courts

have found similar evidence persuasive and determined that the Three-Stripe Mark is strong and

entitled to protection. *Payless*, 546 F. Supp. 2d at 1056; *Target*, 228 F. Supp. 2d at 1212; *ACI*

*Int'l Inc. v. Adidas-Salomon AG*, 359 F. Supp. 2d 918, 921–22 (C.D. Cal. 2005).

Now, Skechers argues that even an arbitrary mark may be weak and entitled to limited

protection where it exists in a "crowded field" of similar marks. Skechers asserts that there are

many shoes which use stripes on their side panels. Def.'s Mot. Summ. J. 17, Table 7. In such a

"crowded field," Skechers argues that "customers will not likely be confused between any two of the crowd and may have learned to carefully pick out one from the other." *Id.* (quoting MCCARTHY § 11:85).

The Court agrees with adidas that its Three-Stripe Mark is entitled to "maximum protection" as an arbitrary mark with no connection to the product that bears it. *Entrepreneur Media*, 279 F.3d at 1141. As to Skechers's "crowded field" argument, adidas reminds the Court that it previously rejected this position at the preliminary injunction stage and that Skechers has not demonstrated that alleged third-party shoes have impaired consumer recognition of the Three-Stripe Mark.

This factor also strongly favors adidas. The commercial and conceptual strengths of the Three-Stripe Mark are undeniable. The mark is ubiquitous across adidas's various products and it has very strong global recognition evidenced by billions of dollars of sales of products bearing the mark.

###### (5)    *Degree of Purchaser Care*

 Skechers claims that consumers exercise a high-degree of care when purchasing footwear. "In assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution." *Payless*, 546 F. Supp. 2d at 1059 (quoting *Sleekcraft*, 599 F.2d at 353). A more expensive product begets a more sophisticated customer whom courts expect to exercise a higher degree of care. *Id.* (citing *Sleekcraft*, 599 F.2d at 353); *see also* MCCARTHY § 23:96 ("The reasonably prudent buyer is assumed to take more care in purchasing 'expensive' items which he buys infrequently, than in buying everyday, relatively inexpensive items."). "[P]urchasers of 'relatively inexpensive athletic and sportswear' are 'not likely to exercise a great deal of care in distinguishing between trademarks when purchasing the

goods.'" *Payless*, 546 F. Supp. 2d at 1060 (quoting *M'Otto Enters., Inc. v. Redsand, Inc.*, 831

F.Supp. 1491, 1502 (W.D. Wash. 1993)) (citing *Gucci Am., Inc. v. Action Activewear, Inc.*, 759

F. Supp. 1060, 1066 (S.D.N.Y. 1991) ("[T]he court has no reason to conclude that the buyers of

casual sportswear represent a particularly sophisticated group of customers.")).

Skechers cites to adidas's expert, Dr. Pham, who stated that "the purchase of sneakers is

typically a moderate-to moderately high-involvement decision." Henn Resp. Decl. Ex. 66, at

¶ 25. Dr. Pham also stated that the purchase of sneakers "is not as involving as the purchase of a

car or a personal computer but is generally more involved than the purchase of groceries or

sundries." *Id.* Skechers further argues that teens and young adults exercise elevated degrees of

care when purchasing footwear and footwear consumers are more sophisticated now than in the

past. Def.'s Mot. Summ. J. 20. The Court previously rejected Skechers's arguments regarding

the sophistication of some customers. Op. & Order 27. Rather, the Court found that the relatively

low cost of footwear, as compared with a boat (the product at issue in *Sleekcraft*), suggests that

shoes are an everyday good that does not invite careful consideration. *Id.* While some footwear

consumers do exercise a high degree of care, most do not, and at the very least, there is a genuine

factual dispute regarding this factor.

Footwear is relatively inexpensive compared with traditional purchases which evoke high

degrees of care such as automobiles, boats, and computers. The shoes at issue in this case are

also moderately inexpensive compared to other shoes. Therefore, this factor favors adidas.

(6)     *Defendant's Intent in Causing Confusion*

Next, Skechers's argues that its serial branding of the Cross Court negates any inference

of the intent to cause confusion with adidas's shoes bearing the Three-Stripe Mark. Def.'s Mot.

Summ J. 16 (citing *Vans*, 2007 WL 4181677, at *8) ("[T]he clear labeling of the accused shoes

with Skechers' brand negates any inference of intent to trade on Vans' mark."). "The law has long been established that if an infringer adopts his designation with the intent of deriving benefit from the reputation of the trade-mark or trade name, its intent may be sufficient to justify the inference that there are confusing similarities." *Brookfield Commc'n, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1059 (9th Cir. 1999) (quotation omitted). "When one party knowingly adopts a mark similar to another's, reviewing courts presume that the defendant will accomplish its purpose, and that the public will be deceived." *Acad. of Motion Picture Arts & Scis. v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1456 (9th Cir. 1991) (citing *Sleekcraft*, 599 F.2d at 354). However, an "intent to confuse consumers is not required for a finding of trademark infringement." *Brookfield*, 174 F.3d at 1059 (citations omitted).

The Court previously found that Skechers had likely acted in bad faith given the parties' numerous prior disputes regarding the Three-Stripe Mark. Op. & Order 28. In particular, the Court was persuaded that Skechers knew about adidas's numerous registrations of the mark, but nevertheless, produced a shoe with a design very similar to it. *Id.* Skechers responds that an intent to deceive cannot be inferred from mere knowledge of a mark and it should not be punished for settling cases in which it did not admit liability and. Def.'s Resp. 22 (citing MCCARTHY § 23:115; *Glow Indus., Inc. v.* Lopez, 252 F. Supp. 2d 962, 1003 (C.D. Cal. 2002)).

While it is clear that Skechers intended to copy the Stan Smith shoe, adidas has not directed the Court to any analogous evidence showing Skechers's intent to copy the Three-Stripe Mark using its "E" design on the Cross Court. The Skecherization of the Cross Court is apparent in several photographs. Further, as discussed above, the parties have raised a genuine factual dispute as to whether the "E" design strongly resembles the Three-Stripe Mark. This factor is neutral.

(7)    *Evidence of Actual Confusion*

Skechers makes two arguments regarding this factor. First, that adidas has produced no

evidence of actual confusion. Second, that Skechers's expert survey is affirmative evidence of no

actual confusion. Evidence of actual confusion is "persuasive proof that future confusion is

likely." *Clicks Billiards*, 251 F.3d at 1265 (quoting *Fuddruckers*, 826 F.2d at 845). A party is

not, however, required to prove actual confusion to succeed in a trademark infringement claim.

*Brookfield*, 174 F.3d at 1050. Consumer surveys are one way to establish actual confusion.

Skechers argues that adidas cannot establish the likelihood of post-sale confusion. In

other words, adidas cannot prove that a person encountering someone on the street wearing the

Cross Court would mistakenly conclude from the "E" design that it was an adidas shoe. Even

though the Cross Court shoe sold approximately 230 thousand pairs while on the market for

sixteen months, Skechers asserts that adidas has produced no evidence that it ever caused actual

confusion. Def.'s Mot. Summ. J. 10. Several of adidas's witness testified that they were not

aware of any confusion regarding the Cross Court and adidas's products. Raphael Decl. Exs. 8,

9, 13, 14. adidas's failure to produce consumer surveys on likelihood of confusion regarding the

Cross Court creates an inference that the results of such surveys would have been unfavorable to

adidas. Despite ample opportunity, none of adidas's four survey experts surveyed the Cross

Court even though they conducted a post-sale confusion survey of the Stan Smith shoe.[1] Raphael

Decl. Ex. 39.

In response, adidas argues that actual confusion is unnecessary to prove likelihood of

confusion. Pl.'s Resp. 36–40. "[B]ecause evidence of actual confusion can be difficult to obtain,

its absence is 'generally unnoteworthy' and given little probative weight." *Cohn v. Petsmart,*

---

[1] This is not to be confused with a consumer survey showing that consumers associate the Stan Smith Trade Dress
with a single source, which adidas did not conduct. *See supra*, Part I.C.

OPINION & ORDER - 41

*Inc.*, 281 F.3d 837, 842 (9th Cir. 2002) (citing *Brookfield*, 174 F.3d at 1050). According to

adidas, it has produced substantial non-survey evidence to demonstrate likelihood of confusion.

*See Monster, Inc.*, 920 F. Supp. 2d at 1075–76 (denying summary judgment and finding that

although the defendant's survey evidence of lack of confusion "was compelling but "not

dispositive" because "a jury could reasonably find [for the plaintiff] on the majority of the

*Sleekcraft* factors").

     As to Skechers's second argument, Butler conducted a survey showing a low-rate of post-

sale confusion. *See* Raphael Decl. Ex. 34. Butler asked respondents to fill out questionnaires

after showing them a video of a model wearing Cross Court shoes in several post-sale scenarios.

Raphael Decl. Ex. 34, at ¶ 38; Exs. 35, 35A. Butler found a post-sale confusion rate of 6.1%

Raphael Decl. Ex. 34, at ¶ 52. According to Skechers, such a low rate is affirmative evidence of

no likelihood of confusion. *See* MCCARTHY § 32.189 ("When the percentage results of a

confusion survey dip below 10%, they can become evidence which will indicate that confusion is

not likely."); *Vans*, 2007 WL 4181677, at *9 (finding 5.4% results of a confusion survey was

evidence of no likelihood of confusion); *Cairns v. Franklin Mint. Co.*, 24 F. Supp. 2d. 1013,

1040 (C.D. Cal. 1998) (collecting cases and holding that 6.9% confusion finding suggests little

likelihood of confusion).

     adidas argues that Butler's survey is flawed in three ways. First, Butler reduced reported

confusion by including close-up shots of the "S" logo on the Cross Court in the very first video

clip shown. Henn Resp. Decl. Ex. 83; Ex 85, at ¶ 15. This caused respondents to identify

"Skechers" as the source of the shoe because they saw the "S" on it. Henn Resp. Decl. Ex. 85, at

¶ 48. Second, Butler's universe was over-inclusive because it covered all prospective and prior

purchasers of "sneakers." *Id.* at ¶ 11. Shoes ranging from $10 to $200 were included in the

survey and the term "sneakers" was never defined. *Id.* Third, Butler miscounted the actual level

of net confusion. Specifically, she counted anyone who mentioned Skechers as a response for

Skechers but did not do the same for adidas. Henn Decl. Ex. 81, at 315:1–15, 316:2–217:17;

318:19–319:21; 321:20–24.

On balance, this factor favors Skechers. adidas has not produced evidence of actual

confusion regarding the Cross Court. adidas's criticisms of Butler's expert report do not relieve it

of its own burden under this factor of producing evidence of actual confusion.

(8)    *Likelihood of Expansion of the Parties' Product Lines*

"The last factor, 'likelihood of expansion,' is concerned with the potential for confusion

which might arise if the parties have plans to expand (or further expand) into each other's

markets." *M'Otto Enters.*, 831 F. Supp. at 1504. "Where two companies are direct competitors,

this factor is unimportant." *Network Automation*, 638 F.3d at 1153. Because adidas and Skechers

directly compete in selling shoes, this factor does not weigh into the analysis.

(9)    *Summary of the* Skillcraft *Factors*

Several of the *Skillcraft* factors weigh in adidas's rather than Skechers's favor.

Accordingly, Skechers has fallen far short of carrying its burden and is not entitled to summary

judgment on adidas's infringement claim against the Cross Court shoe.

**B.    Dilution**

Skechers also moves for summary judgment that adidas cannot establish a likelihood of

dilution. *See* Def.'s Mot. Summ. J 20–22. "Dilution . . . is 'the lessening of the capacity of a

famous mark to identify and distinguish goods or services' of the owner of the famous mark such

that the strong identification value of the owner's trademark whittles away or is gradually

attenuated as a result of its use by another." *Payless*, 546 F. Supp. 2d at 1060 (quoting *Horphag*

*Research Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir. 2007) (quoting 15 U.S.C. § 1127)). "It is

a cause of action 'invented and reserved for a select class of marks—those marks with such

powerful consumer associations that even non-competing uses can impinge on their value.'" *Id.*

(quoting *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 875 (9th Cir. 1999)). "For this reason,

the FTDA applies "only to those marks which are both truly distinctive and famous, and

therefore most likely to be adversely affected by dilution." *Id.* (quoting *Avery*, 189 F.3d at 876).

    To succeed on a trademark dilution claim, a plaintiff must show "(1) the mark is famous

and distinctive; (2) the defendant is making use of the mark in commerce; (3) the defendant's use

began after the mark became famous; and (4) the defendant's use of the mark is likely to cause

dilution by blurring or dilution by tarnishment." *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628,

634 (9th Cir. 2008) (citing 15 U.S.C. § 1125(c)(1)). Skechers only contests the fourth element.

There are two types of dilution: by blurring or by tarnishment. *Jada Toys*, 518 F.3d at 634.

"Dilution by blurring" is defined as "association arising from the similarity between a mark or

trade name and a famous mark that impairs the distinctiveness of the famous mark." 15 U.S.C.

§ 1125(c)(2)(B). A famous mark is considered diluted by tarnishment when the reputation of the

famous mark is harmed by the association resulting from the use of the similar mark. 15 U.S.C.

§ 1125(c)(2)(C).

    The statute identifies a non-exhaustive list of six factors which the court may consider for

determining whether a mark is likely to cause dilution by blurring, including:

> [T]he degree of similarity between the marks, the distinctiveness of
> the famous mark, the extent of the owner's exclusive use of the
> mark, the degree of recognition of the mark, the intent of the user
> of the similar mark, and evidence of actual dilution of the famous
> mark by association.

*Pendleton*, 2012 WL 2721856 at *4 (citing 15 U.S.C. § 1125(c)(2)(B)).

Skechers's dilution arguments are abbreviated forms of its likelihood of confusion arguments discussed above and the Court's analysis therein applies here as well. Regarding the degree of similarity between the marks, Skechers renews its argument that the two marks are not similar. As explained above, the marks do appear to be similar when viewed in certain contexts and the parties have raised a genuine factual dispute regarding this issue. With respect to distinctiveness, the Court has already found that the Three-Stripe Mark is distinctive. With respect to adidas's exclusive use of the mark, Skechers reasserts that the Three-Stripe Mark is merely one of several identical marks and has already been "diluted in fact." Def. Mot. Summ. J. at 21 (citing MCCARTHY § 24:119). Regarding exclusivity and degree of recognition, adidas has produced substantial evidence showing that it exclusively used the Three-Stripe mark and that consumers recognize the mark. Henn Resp. Decl. Ex. 45; Murphy Decl. ¶¶ 8–17. As to intent of the user of the similar mark, Skechers references its argument that its "Skecherization" of the Cross Court negates any inference that it intended to copy the Three-Stripe Mark. Lastly, regarding actual association, Skechers asserts that adidas has produced no evidence that consumers actually associate the "E" design with adidas.

For the same reasons discussed above regarding the likelihood of confusion, Skechers has also failed to carry its burden regarding dilution. Several factors favor adidas and there are genuine factual disputes as to other factors. Accordingly, Skechers's summary judgment motion on adidas's dilution claim is denied.

### C.    *The 1995 Agreement*

adidas moves for summary judgment that the parties' 1995 Agreement was never superseded and is valid. *See* Pl.'s Mot. Summ. J. 13–15. The agreement provides, in relevant part, that Skechers shall not use the Three-Stripe Mark nor will it challenge or contest adidas's

exclusive rights in the mark. Henn Decl. ¶ 5, Ex. 22, at ¶ 2. Skechers does not contest adidas's

motion concerning the enforceability of the parties' 1995 Agreement. *See* Def.'s Resp. 1 n.1.

Accordingly, the Court grants adidas's motion.

## III.    Skechers's Purported Descriptive Fair Use of adidas's Supernova Mark

adidas moves for summary judgment on Skechers's Seventh Affirmative Defense that its

use of the Supernova mark was descriptive fair use. *See* Pl.'s Mot. Summ. J. 11–12. At the

preliminary injunction stage, the Court ruled that adidas was likely to succeed in overcoming

Skechers's descriptive fair use defense. Op. & Order 32–33.

The Lanham Act provides a fair use defense against infringement to a party whose

> use of the name, term, or device charged to be an infringement is a
> use, otherwise than as a mark, . . . of a term or device which is
> descriptive of and used fairly and in good faith only to describe the
> goods or services of such party, or their geographic origin . . . .

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 118 (2004) (quoting

15 U.S.C. § 1115(b)(4)); *see also* McCarthy § 11:45 ("A junior user is always entitled to use a

descriptive term in good faith in its primary, descriptive sense other than as a trademark."). To

establish the defense, the defendant must show: (1) its use of the term is not as a trademark or

service mark; (2) it uses the term fairly and in good faith; and (3) it uses the term only to describe

its goods or services. *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1150–51 (9th Cir. 2002)

(citation omitted). As the degree of likely confusion between the marks increases, the likelihood

that the use is fair decreases. *KP Permanent Make-Up*, 408 F.3d at 607–08; Restatement (Third)

of Unfair Competition § 28 cmt. b (1995) ("[T]he strength of the plaintiff's mark and the extent

of likely or actual confusion are important factors in determining whether a use is fair.").

//

//

### A.    Use of the Term as a Trademark

Because Skechers used Supernova as the name of one of its shoes, adidas argues that it cannot prevail on its descriptive fair use defense as a matter of law. This is evidenced by Skechers's clear labeling of the shoe as the "Supernova" on both its website and on the outside of the Supernova's shoebox. Skechers argues that Supernova does not indicate the source of the goods and was not therefore used as a trademark. Def.'s Resp. 15 (citing 15 U.S.C. § 1127 (stating that trademark is a word or name used "to identify and distinguish" goods and "to indicate the source of goods")). It points out that the word Supernova is small on the shoebox UPC sticker labels and in the website listings and that Skechers's prominent use of source-identifying trademarks minimized the risk that Supernova would be understood in its trademark sense. *See Car-Freshner Corp. v. S.C. Johnson & Son, Inc.*, 70 F.3d 267, 270 (2d Cir. 1995) (finding no indication of trademark use where the product packaging prominently bore the defendant's trademark and corporate logo); *see also* McCarthy § 11:46 (stating that when the challenged word is accompanied by the defendant's own conspicuously visible mark, it generally does not constitute trademark use).

The record contains undeniable evidence that Skechers used Supernova as the shoe's name. Raphael Resp. Decl. Exs. 13, 14. Skechers's argument that it did not use Supernova as a mark because the term does not identify the product's source is beside the point; Skechers plainly used Supernova as the name of its shoe and therefore as a trademark.

### B.    Use of the Term was Fair and in Good Faith

adidas argues that Skechers's fair use defense is undermined by its bad faith use of a name identical to adidas's mark in connection with identical goods. In addition, Skechers

OPINION & ORDER - 47

embedded the term "adidas" as a keyword in the source code of its website offering the Supernova shoe for sale. Henn Decl. ¶ 2; Ex. 7, at 56:18–58:24; Ex. 20.

Skechers claims that there is no record to support that it intended to capitalize on adidas's good will. Rather, Skechers acted in good faith and did not select the term Supernova for any reason related to adidas's trademark. Raphael Resp. Decl. Exs. 9, 18. Skechers claims that it was unaware of adidas's trademark use of the term when Skechers selected it. Skechers attributes its use of the term Supernova to the inadvertence of "a junior employee who was new to her position did not follow Skechers' normal process when she selected the name for the shoe's outsole." Def.'s Resp. 18; Raphael Resp. Decl. Ex. 9, at 52:4–53:13. Lastly, it argues that the presence of the term "adidas" in its website metadata was designed to help customers who were searching for "training or sport" shoes across all of Skechers's sport collection. Raphael Resp. Decl. Ex. 20, at 58:25–59:24.

Skechers has raised a factual dispute as to whether it acted in bad faith. Skechers evidence that it did not know that adidas's Supernova shoe existed is at odds with adidas's evidence that Skechers used the term "adidas" in its website's metadata. In any event, Skechers must prove all three elements to prevail on its affirmative descriptive fair use defense.

### C.    The Term Only Describes Goods

Whether the term was used only to describe goods is the corollary to the analysis above concerning whether it was used as a trademark. adidas argues that the term "Supernova" does not in any way describe Skechers's shoe, rather it is the shoe's name. The color of the shoe is described as "navi/multi" or "blue/multi." Henn Decl. ¶ 2; Ex. 4, at 211–213; Ex. 6, at 74:21–24; Ex. 7, at 30:9–17; Ex. 19. At the preliminary injunction stage, the Court found that there was no

reference to the shoe's "cosmic color scheme" as Skechers had claimed and that it did not use the term as a descriptor. Op. & Order 32.

Skechers claims that "Supernova" was chosen to describe the outer space-like coloring on the shoe's outsole. Def.'s Resp. 14. "As Skechers' Product Manager Jenny Kushida testified, she came up with the name 'supernova' based on the 'bright colors' on the outsoles of the shoes which made her 'think of space and . . . a galaxy or a nebula.'" Raphael Resp. Decl. Ex. 9, 134:13–135:5. It also claims that "navy/multi" and "blue/multi" describe the shoe's upper whereas Supernova describes its outsole. Skechers has failed to put forth any evidence showing that consumers understood Supernova to describe the shoe. As the Court previously found, there is no reference on the shoe's box or on Skechers's website suggesting that Supernova is anything other than the name of the shoe. Furthermore, Skechers's claim that Supernova describes the shoe is belied by its use of the words "navy/multi" and "blue/multi" to describe the coloring of the shoe.

When viewing the evidence in the light most favorable to Skechers, it has not raised a genuine factual dispute that the term was used to describe the goods. Supernova is the name of the shoe. It is the name listed in all caps on Skechers's website and it is the name listed on the outside of the shoebox. Given that Skechers uses other colors to describe the shoe, Skechers's post-hoc explanation that the idea for the name was inspired by the shoe's coloring is insufficient to raise a genuine factual dispute.

In sum, adidas has demonstrated that Skechers used Supernova as a trademark rather than a descriptor of its product. While the parties may dispute whether Skechers's use was in bad faith, Skechers must make out all three elements of its defense and the negation of any one

OPINION & ORDER - 49

element is sufficient to warrant granting summary judgment in adidas's favor. Accordingly,

adidas's motion for summary judgment on Skechers's descriptive fair use defense is granted.

## IV.     Skechers's Profit-Reduction Theories

adidas moves for summary judgment that Skechers's profit-reduction theories are

inapplicable to this case. adidas makes two arguments. First, it asserts that Skechers cannot

deduct overhead costs it did not actually incur with regard to the infringing shoes. Specifically,

Skechers cannot deduct: (1) general selling and distribution expenses; and (2) income taxes from

its gross profits. Second, adidas argues that Skechers cannot measure disgorged profits based on

either its royalty rate or likelihood of confusion survey result theories. Skechers attempts to

reduce disgorged profits by looking at the royalty rate that adidas would have received for the

use of its marks. Alternatively, Skechers seeks to reduce its profits based on the results of its

likelihood of confusion surveys.

### A.     Overhead Costs Deduction

The parties have vastly disparate calculations of Skechers's costs associated with the

disputed footwear. The parties agree that Skechers earned $8.3 million in net sales. The parties

also agree Skechers incurred $4.6 million in costs, putting its total profit at $3.7 million. Pl.'s

Mot. Summ. J. 17; Henn Decl. ¶ 2; Ex. 1, at 18:15–20; Ex. 10, at 190:13–191:2, 193:21–194:8.

adidas believes that the $4.6 million figure accounts for all of Skechers's costs. Skechers, by

contrast, believes that figure only accounts for "landed costs" such a free on board cost, import

duties, and freight. Raphael Resp. Decl. Ex. 2, at ¶ 19. Skechers deducts another $1.7 million in

additional "selling" and "general and administrative" costs as well as income tax expense, further

reducing adidas's potential award. Skechers argues that adidas's motion regarding profits

calculations is improper and premature given courts generally "elect[] to defer judgment on such

matters until trial." Def.'s Resp. 3 (citing *Quia Corp. v. Mattel, Inc.*, No. C 10-1902 JF (HRL)

2011 WL 2749576, at *8 n.5 (N.D. Cal. July 14, 2011).

The Lanham Act provides that if the defendant is found liable for trademark

infringement, then "the plaintiff shall be entitled . . . to recover (1) defendant's profits, (2) any

damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). "In

assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must

prove all elements of cost or deduction claimed." *Id.* "The burden is the infringer's to prove that

his infringement had no cash value in sales made by him. If he does not do so, the profits made

on sales of goods bearing the infringing mark properly belong to the owner of the mark."

*Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 206–07 (1942) (citing

*Hamilton–Brown Shoe Co. v. Wolf Bros. & Co.*, 240 U.S. 251 (1916)). The defendant must

"prove that sales were 'demonstrably not attributable' to the infringing mark." *Nintendo Am.,*

*Inc. v. Dragon Pac. Int'l*, 40 F.3d 1007, 1012 (9th Cir. 1994) (quoting *Wolfe v. National Lead*

*Co.*, 272 F.2d 867, 872 (9th Cir. 1959)).

If the defendant does not carry this burden, all of the profits from the infringing products

belong to the mark owner. "When an accounting of the defendant's profits is appropriate, the

plaintiff is entitled to recover the net profits on sales attributable to the wrongful conduct."

Restatement (Third) of Unfair Competition § 37 cmt. g. "There may well be a windfall to the

trade-mark owner where it is impossible to isolate the profits which are attributable to the use of

the infringing mark. But to hold otherwise would give the windfall to the wrongdoer."

*Mishakawa*, 316 U.S. at 207. Furthermore, in the absence of proof to the contrary, it is presumed

"that the wrongdoer who makes profits from the sales of goods bearing the mark belonging to

another was enabled to do so because he was drawing upon the goodwill generated by that mark." *Id.*

"If the infringer makes or sells several different brands of goods and only one is infringing, then it must apportion costs to the infringing line." McCarthy § 30:68. "Where the infringer can show from his books the percentage of gross income derived from the sale of the infringing goods separate from that of noninfringing goods, overhead costs should generally be apportioned in the same proportion as gross sales." *Id.*

"Any doubts about the actual amount of gross sales or profits will be resolved against the infringing party." McCarthy § 30:66. "If the infringer provides no evidence from which the court can determine the amount of any cost deductions, there is no obligation to make an estimate, and 'costs' need not form any part of the calculation of profits." *Id.* "The infringer's burden of proving deductible costs is not carried by records showing only a vague, undifferentiated category of 'overhead' or 'checks written.'" *Id.*; *see also Winterland Concessions Co. v. Fenton*, 835 F. Supp. 529 (N.D. Cal. Jan. 20, 1994) (stating the rule in the Ninth Circuit is that the defendant may deduct overhead expenses where the defendant can prove that it was "of actual assistance in the production, distribution or sale of the infringing product").

     *(1)*     *Selling and Distribution Expenses*

adidas acknowledges that distribution and selling costs are deductible, but that Skechers has not shown that it actually incurred a particular selling and distribution expense related to the disputed footwear. Henn Decl. ¶ 2, Ex. 1, at 24:13–19, 25:21–31:3. Rather, Skechers attempts to deduct general costs by employing a sale-ratio allocation method which adidas claims the Ninth Circuit has not adopted.

The Ninth Circuit has allowed the "sales-ratio" approach. *See Cyclone USA, Inc. v. LL & C Dealer Servs., LLC*, No. CV 03-992 AJW, 2010 WL 2104935, at *4 (C.D. Cal. May 24, 2010) (citing *Wolfe*, 272 F.2d at 871–72) (holding that the defendant's "sales ratio" approach was proper where its expert apportioned revenues and costs between "Tornado" and non-"Tornado" devices). In *Wolfe*, the defendant attempted to apply the sales-ratio method to apportion costs attributable to "Dutch" versus non-"Dutch" products. 272 F.2d at 871–72. The Ninth Circuit held that "[t]his method is recognized as proper where a more exact basis of apportionment is not available." *Id.* at 872 (citations omitted). The Ninth Circuit found that while the method was sound, the defendant failed to carry its burden of proving that the sales were attributable to the infringing mark. *Id.*

The Ninth Circuit has also explained that it is not enough that the defendant "introduced evidence of their total overhead costs allocated on a reasonable basis. . . . a defendant additionally must show that the categories of overhead actually contributed to sales of the infringing work." *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 516 (9th Cir. 1985). The infringer is not required to prove the relationship in "minute detail" but it "bears the burden of explaining, at least in general terms, how claimed overhead actually contributed to the production of the infringing" product. *Id.* (citations omitted); *see also Winterland Concessions*, 835 F. Supp. at 533 (internal citations omitted) ("Where more precise methods of allocating costs are not available, defendants may allocate costs based on the infringing products' share of gross revenues, so long as there is, in addition, evidence to support a finding that each item included in fixed costs actually contributed to the infringing product.").

Skechers accounting system does not track the relevant selling and distribution expenses by specific shoe style. Def.'s Resp. 5–6. Accordingly, it employs a sale-ratio allocation method

which "allocates the amount of Skechers' total relevant selling and distribution expenses to the

accused shoes based on the percentage of the company's total revenues that comprises the styles

at issue." *Id.* at 6 n.4; Raphael Resp. Decl. Ex. 5, at 23:6–24:2. Skechers asserts that Mr.

Ackerman deducted allocated overhead expenses totaling $578,000 in selling and distribution

expenses that directly contributed to the sale, production and distribution of the disputed

footwear. Raphael Resp. Decl. Ex. 2, at ¶¶ 21–25, Schedules 2, 5. Skechers calculates its

deduction based on its overall sales and expense information as disclosed in the company's

public financial statements. *Id.*

To the extent that adidas's motion asks the Court to rule, as a matter of law, that Skechers

cannot deduct overhead costs that it did not actually incur, the motion is granted. The parties

agreed at oral argument that Skechers carries the burden of showing that it incurred particular

overhead costs related to the disputed footwear. Granting adidas's motion merely confirms that

the Court is required to instruct a jury at trial that Skechers carries this burden.

However, to the extent that adidas's motion asks the Court to grant summary judgment

that no more than $4.6 million may be deducted from Skechers's profits, the motion is denied.

Skechers has raised a genuine factual dispute as to whether overhead costs actually contributed

to the sale, production, and distribution of the disputed footwear. After reviewing Ackerman's

report and the parties' arguments, it is clear that the deduction of overhead costs is an issue for

the trier of fact.

    *(2)*   *Income Tax Expense*

adidas argues that deducting income taxes is inappropriate as a matter of law. Ackerman

used income tax expenses to reduce Skechers's profits by $1,187,608. Raphael Resp. Decl. Ex.

2, at ¶¶ 25–26, Schedule 2. "Income tax paid by the defendant on the profits for which it is

OPINION & ORDER - 54

accountable should not generally be deducted in computing the defendant's liability."
Restatement (Third) of Unfair Competition § 37, cmt. g. No income tax deduction is allowed if
the infringement is "one of conscious and deliberate wrongdoing." MCCARTHY § 30:67 (quoting
*L.P. Larson, Jr., Co. v. Wm. Wrigley, Jr., Co.*, 277 U.S. 97, 99 (1928) (Holmes, J.)) *see also*
*Clamp Mfg. Co. v. Enco Mfg. Co.*, No. CV 82-4352 (CBM), 1987 WL 46520, at *7 (C.D. Cal.
Aug. 10, 1987) ("In the absence of mitigating circumstances, income taxes are not proper
deductions."). "[S]uch a deduction would be unfair where the plaintiff would have to pay income
tax on the profits it received from the infringer." MCCARTHY § 30:67 Both McCarthy and the
Restatement note that income tax should not be deductible because the defendant can ordinarily
claim the profits paid to plaintiff under the judgment as a deductible business expense, which
could allow the infringer to net as much as its victim. Such results do not discourage
infringement. *See* MCCARTHY § 30:67; Restatement (Third) of Unfair Competition § 37, cmt. g.

   Skechers argues that the applicability of an income tax deduction turns on whether a
defendant's infringement is found to be willful. This argument has legal support. *See L.P.
Larson, Jr.*, 277 U.S. at 99–100 (holding that there are some cases which deducting federal
income taxes from profits would be proper but given the defendants "conscious and deliberate
wrongdoing" that particular deduction was not allowed). The general rule appears to be that such
a deduction is prohibited but that it may be warranted under "mitigating circumstances." *Clamp
Mfg. Co.*, 1987 WL 46520, at *7. However, the Court has found no case law on this issue
providing examples of what "mitigating circumstances" might warrant allowing a defendant to
deduct income taxes. Neither party provides binding Ninth Circuit precedent categorically
prohibiting or permitting the deduction of income taxes from profits. As Skechers rightly points
out, the issue of its willfulness is contested.

The Court reserves ruling on this issue until liability is determined. If Skechers's is found liable and its infringement is shown to be willful at trial, then the law clearly prohibits the deduction. On the other hand, if Skechers is able to prove "mitigating circumstances," then it may be entitled to a jury instruction regarding the deduction.

### B.    Profit-Reduction Theories

Next, adidas argues that Skechers cannot limit adidas profit award based on a sub-set of Skechers's profits. Skechers presents two theories for "apportioning," or in other words, reducing, its profits. Skechers proposes reducing its profits based on a royalty rate or based on Skechers's likelihood of confusion survey. Under the first theory, adidas's base profit award would be reduced to an amount that Skechers would have paid to adidas if the parties had a royalty agreement. Under the second theory, adidas's base profit award would be reduced to an amount proportionate with the post-sale confusion rates from Butler's likelihood of confusion surveys.

Once more, the Lanham act authorizes the plaintiff to recover *all* of defendant's profits and the defendant bears the burden of proving any costs or deductions. 15 U.S.C. § 1117(a). As stated above, it is presumed that the infringer's profits are due to the goodwill generated by the mark. *See Mishakawa*, 316 U.S. at 207. The defendant must prove that the sales were demonstrably not attributable to the infringing work in order to deduct them. *Nintendo*, 40 F.3d at 1012. "[W]here infringing and noninfringing elements of a work cannot be readily separated, all of a defendant's profits should be awarded to a plaintiff." *Id.* (citing *Hamilton–Brown Shoe*, 240 U.S. at 261–62). In *Hamilton-Brown Shoe*, a trademark case also involving shoes, the Supreme Court explained why "apportionment" was inherently impossible in that case:

> [A] sufficient reason for not requiring complainant in the present
> case to make an apportionment between the profits attributable to

OPINION & ORDER - 56

> defendant's use of the offending mark and those attributable to the
> intrinsic merit of defendant's shoes is that such an apportionment
> is inherently impossible. Certainly, no formula is suggested by
> which it could be accomplished.

240 U.S. at 261–62. While apportionment may not be applicable here, Skechers

has provided two theories outlined above to support it.

### (1)    Royalty Rate Theory

As a preliminary matter, this argument should not be confused with adidas's claim that it

is entitled to reasonable royalty damages. That claim is discussed in further detail below and

involves adidas's assertion that it would be entitled to damages based on a royalty rate *in*

*addition to* its base award of profits. At issue here is Skechers's attempt to reduce adidas's profit

award using a royalty rate. adidas argues that there is no legal basis for such a reduction, it is

contrary to trademark law and policy, and it would produce a nominal award.

adidas's argument heavily relies on *Playboy Enters., Inc. v. Baccarat Clothing Co.*, 692

F.2d 1272 (9th Cir. 1982). In that case, the defendant sold jeans bearing the plaintiff's "Playboy"

and "Rabbit Head" design trademarks without a license. *Id.* at 1273–74. The district court

awarded the defendant $12,750 in damages based on the revenue that the plaintiff would have

received had the infringing sales been licensed at its standard royalty rate of 5%. *Id.* The Ninth

Circuit found that the policy considerations underlying prior trademark decisions disfavor "an

award of little more than nominal damages" because such an award would "encourage a

counterfeiter to merely switch from one infringing scheme to another as soon as the infringed

owner became aware of the fabrication." *Id.* at 1274. It concluded that such enforcement would

"fail to serve as a convincing deterrent to the profit maximizing entrepreneur who engages in

trademark piracy." *Id.* The court also explained that the consuming public is equally injured by

an inadequate judicial response to trademark infringement and that "it is essential that the trial

OPINION & ORDER - 57

courts carefully fashion remedies which take all the economic incentive out of trademark infringement." *Id.* at 1275. An Infringer would simply pay such nominal award as a "judicial expense." *Id.*

The Ninth Circuit reversed the district court's refusal to award profits and awarded the plaintiff the full profits for the jeans that had been sold, $120,000. *Id.* The *Playboy* Court explained that its decision could "be summarized in one question: Would a profit seeking businessperson, not willing to violate federal law, pay ten cents to make one dollar? If the answer is 'yes' then the trial court's decision did not follow this court's clear mandate in *Maier* to make willful trademark infringement unprofitable." *Id.*

Skechers argues that Ackerman's calculation is based on adidas's own royalty rate. Def.'s Resp. 9. adidas's royalty rate is 6%, which Ackerman calculated would put Skechers's profits attributable to the Supernova and Cross Court shoes at $495,000. Raphael Resp. Decl. Ex. 2, at ¶¶ 34–36. In Skechers's view, it should not have to disgorge the portion of its profits attributable to its own branding and trademarks.

*Playboy* is controlling here. Skechers cannot reduce adidas's profits using its royalty rate theory. Under the Lanham Act, a prevailing plaintiff is entitled to both "defendant's profits" and "any damages sustained by the plaintiff." 15 U.S.C. § 1117(a). The Ninth Circuit made clear in *Playboy* that awarding only royalty rate damages and withholding an accounting of profits would be contrary to the policy considerations underpinning trademark law. Skechers argues that *Playboy* does not discuss the issue of reducing profits using royalty rates. This argument is beside the point. If the Court did reduce profits based on a royalty rate and denied royalty rate damages (which Skechers argues that it should), then Skechers would pay out the same type of award that the Ninth Circuit vacated in *Playboy*. Assuming that Skechers is found liable, an

OPINION & ORDER - 58

award based on a royalty rate would be nominal, would serve only as a "judicial cost" of doing business, and would fail to deter Skechers from future infringement. Therefore, the Court grants adidas's motion for summary judgment that Skechers cannot reduce its profits using a royalty rate theory.

### (2)    Likelihood of Confusion Survey Theory

Skechers argues that if found liable, adidas is only entitled to profits based on the percentage of confusion rates found in its likelihood of confusion surveys. Skechers's expert Butler found that the post-sale confusion rate was 20.5% for the Onix and 6.1% for the Cross Court. Raphael Resp. Decl. Ex. 38, at ¶ 4; Ex. 34, at ¶ 52. Using those survey results, Ackerman calculated that Skechers's apportioned profits would be $2,000 for the Onix and $ 104,000 for the Cross Court. Def.'s Resp. 11; Raphael Resp. Decl. Ex. 1, at ¶¶ 40–42; Ex. 2, at ¶¶ 27–33.

adidas responds that Skechers attempts to conflate trademark liability with trademark damages. Skechers's likelihood of confusion surveys are used as one piece of evidence for establishing liability. A survey can produce evidence of the likelihood of confusion but it "does not permit a mathematically precise projection to the universe at large." MCCARTHY § 32:165. adidas further argues that the surveys did not include those consumers who actually purchased the disputed footwear and has no real connection to Skechers's actual profits made from those shoes. Pl.'s Mot. Summ. J. 24.

The Court agrees with adidas that Skechers conflates evidence of infringement with evidence of damages. There is no support in the law for Skechers's theory that it can reduce its profits under 15 U.S.C. § 1117(a), by using the rate of confusion results from its likelihood of confusion surveys. The likelihood of confusion surveys in this case only show that some people, who did not actually purchase the disputed footwear, reported that they were confused about the

OPINION & ORDER - 59

origin of a particular shoe in different contexts. Under 15 U.S.C. § 1117(a), Skechers carries the

burden of demonstrating that its "infringement had no cash value in sales," otherwise, its profits

from the infringing mark belongs to adidas. *Mishakawa*, 316 U.S. at 206–7. The likelihood of

confusion surveys have no bearing on the cash value of Skechers's sales of the disputed

footwear, nor do they measure the amount of actual confusion in the marketplace among those

who purchased the disputed footwear. Moreover, the surveys do not describe any cost

attributable to the disputed footwear that Skechers may otherwise deduct from its profits under

15 U.S.C. § 1117(a). Accordingly, the Court grants summary judgment that Skechers cannot use

its likelihood of confusion survey results to reduce its profits.

**V.    adidas's Claim for Royalty Rate Damages**

Lastly, Skechers moves for summary judgment on adidas's claim for actual damages

based on a reasonable royalty rate. In addition to the $3.7 million that adidas seeks in profits, it

also claims $515,183 in actual damages based a royalty rate. Skechers argues that reasonable

royalty damages are atypical in trademark cases and that adidas cannot prove such damages with

reasonable certainty.

The Lanham Act permits the recovery of damages but it does not specify reasonable

royalty damages, unlike patent law. *Compare* 15 U.S.C. § 1117(a); *with* 35 U.S.C. § 284.

"Usually, when the courts have awarded a royalty for past acts of infringement, it was for

continued use of a mark after a license ended and damages were measured by the royalty rate the

parties had agreed on." MCCARTHY § 30:85. Courts will use a royalty basis for measuring

damages where the infringer offers a royalty rate but the trademark owner refused to grant a

license. *Id.* "Royalty rate is appropriate where it bears a 'rational relationship to the rights

appropriated' such as where the infringer appropriates everything which a fully royalty is

OPINION & ORDER - 60

payment for." *Id.* (quoting *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 920 (Fed. Cir. 1984)).

Reasonable royalty damages, like other damages, "must be established with reasonable certainty," and that damages that are remote or speculative should be denied. *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407–08 (9th Cir. 1993). Royalty damages have been awarded in limited situations where the parties had a "trademark licensing relationship that facilitates computation of the reasonable royalty." *Juicy Couture, Inc. v. L'Oreal USA, Inc.*, No. 04 CIV. 7203(DLC), 2006 WL 1359955, at *4 (S.D.N.Y. May 18, 2006).

Skechers asserts that courts have rejected such damages where no preexisting license between the parties existed. *See Tokidoki, LLC v. Fortune Dynamic, Inc.*, No. CV 07-1923 DSF (PJWx), 2009 WL 2366439, at *15 (C.D. Cal. July 28, 2009). Here, Skechers claims that royalty damages are entirely speculative given that the parties have never entered into any trademark licenses. Def.'s Mot. Summ. J. 42; Raphael Decl. Ex. 20, at 171:4–174:7. Such damages are rendered even more hypothetical given that adidas has a policy of never licensing marks to third parties for use on footwear in the U.S. except in very limited areas. Raphael Decl. Ex. 42, at 5. This absence of licensing history, in Skechers's view, renders adidas's trademark royalty claim speculative.

The Court disagrees with Skechers. Reasonable royalty rate damages are available to adidas in this case. Courts in this circuit have permitted royalty rate damages in the absence of prior licensing agreements between the parties where evidence provided a sufficiently reliable basis from which the courts could calculate such damages. *See QS Wholesale, Inc. v. World Mktg., Inc.*, No. SA 12-CV-0451 (RNBx), 2013 WL 1953719, at *4 (C.D. Cal. May 9, 2013) (collecting cases). In *Payless*, for example, Judge King upheld the jury award of royalty damages

even though adidas conceded that it would not have licensed its marks to Payless because the award was "consistent with the royalties between adidas or Payless with third parties and also with royalties between the parties." 2008 WL 4279812, at *12. *Payless* demonstrates that courts can look to royalty rates from either party to support such an award. *Id.* In this case, both parties have trademark licensing regimes that could provide a framework for calculating a reasonable royalty. Henn Resp. Decl. Ex. 58, at 34–40; Exs. 45–46. Skechers's cases such as *Tokidoki* and *Quai* are distinguishable on the grounds that in the former, the expert had presented no testimony on a royalty rate, 2009 WL 2366439, at *9, and in the latter, the plaintiff produced no record of a licensing regime with the defendant or any third party. 2011 WL 2749576, at *6.

Skechers is not entitled to summary judgment on this issue. Skechers is correct that courts have denied such damages where either the method of calculating such damages or evidence of prior licensing was inadequate. However, *Payless* is on point, and Skechers has not demonstrated that reasonable royalty damages are unavailable to adidas as a matter of law. Furthermore, adidas has raised a genuine factual dispute as to the parties' royalty rate calculation regimes.

CONCLUSION

The Court denies Skechers's motions with respect to adidas's substantive infringement claims as to all of the disputed footwear. There are factual disputes regarding whether the Stan Smith Trade Dress is generic and Skechers has failed to show that it is entitled to summary judgment that the trade dress has not acquired distinctiveness through secondary meaning. The Court grants adidas's motion on Skechers's Fourth Affirmative Defense (functionality). A balancing of the *Disc Golf* factors favors adidas notwithstanding any dispute as to any one factor. With respect to the Cross Court shoe, the *Sleekcraft* factors favor adidas. For that reason,

Skechers motion regarding the Three-Stripe Mark is denied as well. In addition, the Court grants adidas's unopposed motion to declare the 1995 Agreement valid and not superseded. The Court grants adidas's motion regarding Skechers's Seventh Affirmative Defense (descriptive faire use) as to the Supernova Mark. While Skechers has raised a factual dispute concerning whether it acted in bad faith, it cannot dispute that it used the term Supernova as the name for the shoe rather than to describe the shoe.

The Court grants in part adidas's motion that Skechers cannot claim overhead costs that it did not actually incur. The motion is denied to the extent that it asks the Court to adopt adidas's profit and costs calculations given that the parties have raised factual disputes as to whether the overhead costs actually contributed to production and distribution of the disputed footwear. The Court reserves ruling on adidas's motion that Skechers cannot deduct income tax expenses from its profits. The Court grants adidas's motion that Skechers cannot reduce its profits using a royalty rate theory or its likelihood of confusion survey. The Court denies Skechers's motion that adidas cannot claim reasonable royalty rate damages.

Dated this ⟨3⟩ day of ⟨August⟩, 2017.

MARCO A. HERNÁNDEZ
United States District Judge

OPINION & ORDER - 63

# United States Court of Appeals
# for the Federal Circuit

## CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on   <u>August 10, 2017</u>   by:

    ☐ U.S. Mail

    ☐ Fax

    ☐ Hand

    ☒ Electronic Means (by E-mail or CM/ECF)

<u>   Aaron P. Bowling   </u>      <u>   /s/Aaron P. Bowling   </u>

Name of Counsel            Signature of Counsel

Law Firm:          Banner & Witcoff, Ltd.
Address:           10 S. Wacker Drive, Suite 3000
City, State, Zip:    Chicago, IL 60606
Telephone Number:  312.463.5000
Fax Number:     312.463.5001
E-Mail Address:    abowling@bannerwitcoff.com